UNITED STATES of America, Plaintiff,

v.

John DEMJANJUK, Defendant.

No. C77–923.

United States District Court,
N. D. Ohio, E. D.

June 23, 1981.

John J. Horrigan, Asst. U. S. Atty., Cleveland, Ohio, Norman A. Moscowitz, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

John W. Martin, Spiros Gonakis, Cleveland, Ohio, for defendant.

## MEMORANDUM DECISION AND ORDER

BATTISTI, Chief Judge.

This is an action under the Immigration and Nationality Act of 1952, 8 U.S.C. § 1451(a), to revoke the Certificate of Naturalization of the defendant, John Demjanjuk, also known as Iwan Demjanjuk, and to vacate the order admitting him to United States citizenship. The defendant was admitted to the United States for lawful permanent residence on February 9, 1952, pursuant to the Displaced Persons Act of 1948, ch. 647, 62 Stat. 1009, *as amended by* the Act of 1950, 64 Stat. 219 [henceforth referred to as the DPA]. On November 14, 1958, the defendant became a United States citizen by order of the United States District Court, Cleveland, Ohio.

The Government's amended complaint alleges that the defendant served with German SS (Schutzstaffel) personnel during World War II at three locations during 1942–1943:

(1) at the SS training camp at Trawniki, Poland;

(2) at the extermination camp at Treblinka, Poland; and

(3) at the extermination camp at Sobibor, Poland.

The Government's complaint further alleges that defendant served in a German military unit composed of Ukrainians at times during 1944–1945.

Section 1451(a) of the Immigration and Nationality Act, provides that citizenship can be revoked if it was either illegally procured, or procured by concealment of a material fact or by willful misrepresentation. The Government's six-count complaint alleges that defendant should be denaturalized under both criteria. In Counts I–II, the Government alleges that defendant illegally procured his citizenship because (1) his activities during the war precluded him from obtaining a valid visa as an "eligible displaced person" under the DPA, and (2) the visa actually obtained by the defendant was invalid since he willfully misrepresented his whereabouts during the war. Counts III–IV allege that defendant procured his naturalization by concealing and misrepresenting his service with German SS and military personnel during the years in question. The Government also alleges that defendant illegally procured his naturalization since he was not a person of good moral character. Count V alleges that defendant lacked the good moral character required for naturalization because of the commission of atrocities against Jewish prisoners at the extermination camp of Treblinka. Count VI alleges that defendant's failure to disclose his service in the German SS and the German military in his Application to File Petition for Naturalization (INS Form N–400) also indicates a lack of the good moral character that is a prerequisite to naturalization.

The right of citizenship once conferred should not be taken away without the clearest proof. As the Supreme Court recently reiterated, the Government has the burden of proving by "clear, unequivocal and convincing" evidence that defendant obtained his citizenship illegally or fraudulently. *Fedorenko v. U. S.*, —— U.S. ——, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981) (citing *Schneiderman v. United States*, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796 (1943)). This requirement is mandated by the magnitude of the right that is at stake in a denaturalization proceeding:

"Citizenship obtained through naturalization is not a second-class citizenship. It has been said that citizenship carries with it all of the rights and prerogatives of citizenship obtained by birth in this country 'save that of eligibility to the Presidency.' "

*Knauer v. United States*, 328 U.S. 654, 658, 66 S.Ct. 1304, 1307, 90 L.Ed. 1500 (1946) (quoting *Luria v. United States*, 231 U.S. 9, 22, 34 S.Ct. 10, 13, 58 L.Ed. 101 (1913)).

## FINDINGS OF FACT

The defendant, John Demjanjuk, was born on April 3, 1920, in the village of Dub Macharenzi, Ukraine, a republic of the U.S.S.R. His father's name in Ukrainian is Mikola, the Russian form of which is Niko-

lai. (Tr. 28A) Defendant had little formal education, completing four grades of school while in the Ukraine. In 1939, defendant lived in Dub Macharenzi and worked as a collective farmer, sometimes as a tractor driver. Defendant was conscripted into the Russian army in 1940. On June 22, 1941, Germany invaded the U.S.S.R.

Three months after the war began, defendant, then a member of an artillery unit, was wounded in his back by shrapnel. The wound required hospitalization and upon release from the hospital, defendant returned to the front in the Crimea. Defendant admits that he was captured at the Battle of Kerch in the Crimea in 1942. (Tr. 1091) The Government called Dr. Earl F. Ziemke, a military historian specializing in the Eastern Front during World War II, who testified that from May 8–19, 1942, a major battle between the Germans and Russians did occur in the Kerch which resulted in 125,000 Russian soldiers being captured. (Tr. 51A–54A) It is likely, therefore, that defendant was captured by the German army no later than May 19, 1942.

Dr. Ziemke further testified that the Russian prisoners of war were then moved west from the Crimea to German POW camps, including Rovno, in the Western Ukraine, and Chelm, Poland. (Tr. 55–A) Defendant testified that after being captured he was in fact transferred first to Rovno for a few weeks and then to Chelm. (Tr. 1069) Defendant did not recall the exact dates of this translocation, but testified he was in Rovno during 1942–1943 and in Chelm until 1943 or 1944. The Government produced additional evidence on the estimated chronology of when defendant was transferred from the Crimea to Rovno and then to Chelm. Government's exhibits 2 and 3 are certified copies of excerpts from German war diaries containing a daily chronicle of prisoners captured in the battle of Kerch in the Crimea in May 1942, and the subsequent relocation of such prisoners in German POW Camps. Government Exhibit 2 rec-

ords that on May 16 and May 17, 1942, approximately 5,000 prisoners from the battle of Kerch were transported to Rovno. (Tr. 62A) Government Exhibit 3 indicates that 1,400 prisoners, mostly from the battle of Kerch, arrived in Chelm on June 2, 1942, and that other prisoners arrived in Chelm later on June 4–5, 1942. (Tr. 63A).

The Court concludes that it is likely that the defendant was transferred from the Crimea to the POW camps of Rovno and Chelm sometime in May–June 1942. Defendant offered no evidence on a more exact chronology and the accepted chronology was deemed plausible by expert testimony. (Dr. Ziemke, Tr. 58A–68A) Defendant's statement that he might have been in Chelm sometime in 1944 was contradicted by Dr. Ziemke's testimony that the Germans probably would not have maintained a POW camp at Chelm, Poland, any later than January 1944, since the Russian front was quickly moving westward at this time. (Dr. Ziemke, Tr. 1129–32)

Up to this point, the Government's evidence essentially corroborates and amplifies the defendant's own admissions concerning his service in the Russian army and subsequent capture by the Germans. The major factual issues in this trial concern the defendant's whereabouts following his incarceration at the POW camp at Chelm. The Government believes that defendant was next transferred to Trawniki, Poland, a training camp run by the German SS, and was sent from there to Treblinka, Poland, where he assisted in the persecution and extermination of the Jews. Defendant denies ever being at either location. An examination of the historical relationship between Trawniki and Treblinka is prerequisite to an understanding of the evidence in this case.

In 1942 the Nazis initiated "Action Reinhard" in Poland, a codeword for the systematic extermination of the Jews from all the countries of Europe occupied by German forces.[1] Three extermination camps were

---

1. Historical background on Action Reinhard and the relationship between the SS camp, Trawniki, the German POW camps, and the

extermination camps was provided by the expert testimony of Dr. Wolfgang Scheffler. Dr. Scheffler is a professor of political science at

constructed to implement the mass annihilation conceived by Action Reinhard. Two camps, Belzec and Sobibor, were located in the Lublin district of Poland, southeast of Warsaw. The third camp, Treblinka, was located in the district of Warsaw. (Tr. 98A) The German SS directly authorized Action Reinhard, although personnel from the "euthanasia program" [2] were also often used in actually implementing the plan. (Tr. 103A–104A)

The German SS lacked sufficient manpower in the Lublin district to carry out all the "tasks" of Action Reinhard. (Tr. 109A) Consequently, Russian POWs were employed in rounding up and transporting the Jews from the ghettoes to which they had been confined and also as staff in the concentration camps themselves. (Tr. 106A) These Russian POWs were obtained from prisoner of war camps in Eastern Poland, among them, Rovno and Chelm. (Tr. 107A) Prisoners from Rovno and Chelm were taken to Trawniki, a camp operated by the German SS, located southeast of Lublin.[3] (Tr. 7–8)

Once at Trawniki, the Russian POWs were given uniforms (at first black and later earth brown), organized into companies, platoons, and groups and given training in weapons. (Tr. 116A–118A) Upon entering these new units, the former POWs took an oath of service to the German SS and in fact were subject to the rules and regulations governing the German SS.[4] There was testimony that Ukrainian soldiers at Trawniki were paid a salary in Polish currency. (Tr. 194) Units of these Trawniki guards were transferred to the concentration camps of Belzec, Sobibor, and Treblinka where they performed most of the duties that were necessary in the extermination camps, including guarding the camp and supervising the Jewish victims as they were being herded to the gas chambers. (Tr. 118A–119A) According to expert testimony, these Trawniki guards were indispensable to the operation of Action Reinhard.[5] Action Reinhard came to a conclusion in the late fall of 1943 when Jewish prisoners revolted at Sobibor and Treblinka, and all three of the concentration camps were subsequently destroyed and camouflaged. (Tr. 123A; 133A)

### A. Government's Evidence That Defendant Was At Trawniki

The Government's proof that the defendant was at Trawniki are Government's Exhibits 5 and 6, two sides, front and back, of a single German war document, the original of which is in the Vinnitskiy Oblast State

the Free University of Berlin and is an authority on the Nazi persecution of the Jews. Dr. Scheffler has also offered his expert opinions in several German trials concerning participants at the extermination camps of Sobibor and Treblinka. (Tr. 78A–94A)

2. Between 1939–1941 approximately 100,000 so called "mentally ill" persons were exterminated under the euthanasia program in special hospitals which later served as models for the extermination methods used to exterminate the Jewish population. (Tr. 104A)

3. *See United States v. Fedorenko*, 455 F.Supp. 893, 900 (S.D.Fla.1978), *rev'd* 597 F.2d 946 (5th Cir. 1979), *aff'd on other grounds* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 806 (1981). [henceforth, *Fedorenko*]. In this case the defendant testified that he was a Russian soldier, captured by the Germans, transported first to a POW camp at Rovno, then to a camp at Chelm, and finally to Trawniki. Fedorenko was even-

tually transported to Treblinka in September 1942.

4. *See also* testimony of Heinrich Schaefer. (Tr. 188–192) Schaefer indicated that the Ukrainian guard units were technically not members of the German SS. (Tr. 208)

5. Dr. Scheffler testified that at each of the three concentration camps, Belzec, Sobibor, and Treblinka the number of Trawniki guards significantly exceeded the German staff assigned to the camps. (Tr. 119A) It is estimated that over the entire period of Trawniki's existence, between 3,500 and 4,000 men were trained by the Germans. (Tr. 121A) The estimated number of Trawniki guards periodically serving at these concentration camps during Action Reinhard is Belzec (60); Sobibor (200); Treblinka (120). (Tr. 119A) It is conjectured that transfers occurred between Trawniki and the three other camps on the basis of need and exigency. (Tr. 121A)

Archive, U.S.S.R.[6] The Court initially received certified photographic copies of the document (Govt. Exs. 5–6) under Fed.R. Evid. 902(3)–(4). During the course of the trial, the original was made available by Soviet authorities for inspection and study by the Court and by the defendant. Photographic enlargements of the original document, Government's Exhibits 5(b) and 6(b) were then substituted for the original, which was returned to the custody of the Soviet archive.

Throughout the trial, defendant contended that Government's Exhibits 5 and 6 were not authentic and suggested the possibility of forgery. However, at no time during the entire course of the trial was *any* evidence introduced to substantiate these speculations. Since the Court concludes that the defendant was present at Trawniki based on an examination of Government's Exhibits 5 and 6, it is necessary to review the evidence supporting the authenticity of this document (to be referred to as the "Trawniki card").

Government's Exhibit 5 is an identification card clearly stating that "Iwan Demjanjuk is employed as a guard in the Guard Units (Wachmannschaften) of the Reich Leader of the SS for the Establishment of SS and Police Headquarters in the New Eastern Territory." The card carries the additional heading in boldface printing: "HEADQUARTERS LUBLIN, TRAINING CAMP TRAWNIKI, I.D. No. 1393."

Dr. Wolfgang Scheffler, an historian thoroughly familiar with German war documents (Tr. 85A–90A; 10–19), identified Government's Exhibit 5 as a service identification card, issued by the German SS, bearing the stamp of the SS Polizeifuhrer in the district of Lublin, and signed by Karl Streibel, the commandant of the Trawniki camp. (Tr. 19–25) It should be noted that although Dr. Scheffler testified that he had never seen a card identical to Exhibit 5 (Tr. 99–100), his testimony verified all the indicia on the card as being historically accurate.[7] Scheffler testified that such a card would have to have been issued during the period July 1941–July 1942, since the appellation "Representative of the Reichsfuhrer-SS for the Establishment of SS and Police Headquarters in the New Eastern Territory" was only in use during this period. (Tr. 23)

The testimony of Dr. Scheffler was corroborated by the testimony of Heinrich Schaefer. (Tr. 178 *et seq.*) Schaefer was a Russian soldier, captured by the Germans in Poland, and taken to Trawniki at the end of August 1941. (Tr. 185–188) At Trawniki, Schaefer worked as a paymaster in the camp's administrative office, paying the camp's Ukrainian guards. (Tr. 194) The official title of the Trawniki camp administration where Schaefer worked was "SS Standortverwaltung Lublin, Zweigstelle Trawniki" which translated means SS Garrison Lublin, Branch Office of Trawniki.[8] (Tr. 194) Schaefer was shown Government's Exhibit 5 and testified that it was an official I.D. card issued to all the persons training at Trawniki, that he himself had been issued such an I.D. card. (Tr. 215) Schaefer also identified the signature of Streibel, the camp commandant, since Streibel had often signed his leave passes. (Tr. 215)

The reverse side of the Trawniki card is Government's Exhibit 6. The left side of this exhibit contains a photograph, allegedly of the defendant, his name, family history, personal characteristics, and army assignments. The right side of Exhibit 6 contains a checklist of issued equipment, the signature of the issuing officer, Teufel,

---

6. The advancing Russian armies that pushed the Germans westward across Poland in 1944–1945 captured many war documents, including the administrative files of the German SS in the district of Lublin. Trawniki is located within the Lublin district. (Scheffler, Tr. 10)

7. Neither party produced another document exactly like Government's Exhibits 5 and 6 and the Government is not aware of the existence of another document similar to the Trawniki card. (Tr. 1150–1151)

8. A "Standortverwaltung" in the Germany army lexicon signified the administrative army unit responsible for providing housing and equipment in the particular area involved.

and the alleged signature of the defendant, indicating receipt of the enumerated equipment.

Dr. Scheffler was shown Exhibit 6 and indicated, again, that he had never seen a card exactly like Exhibit 6. However, Dr. Scheffler's testimony nevertheless verified the historical accuracy of the indicia found on the card. Particularly, Scheffler noted that the two stamps overlapping the photograph bear the legend: "SS Standortverwaltung Lublin, Zweigstelle Trawniki." (Tr. 25–28) Dr. Scheffler testified that it is known from former members of the Standortverwaltung of the branch Trawniki that one of the responsibilities of the administration was to provide supplies and equipment for the guard units stationed at Trawniki. (Tr. 26) This testimony is not only internally consistent with the equipment marked as "issued" on the right side of Government Exhibit 6, but corroborates the testimony offered by Heinrich Schaefer.

Schaefer recognized the "Standortverwaltung stamp" on Exhibit 6 as the "official seal of our unit in Trawniki." (Tr. 211–212) In addition, he testified that a man by the name of Ernst Teufel was in charge of the disposition of clothing within the administration (Tr. 195), and that Teufel held the rank of SS Rottenfuhrer or private first class. (Tr. 196) Upon examining the signature of "Teufel, SS Rottenfuhrer" on Exhibit 6, Schaefer indicated that this was the familiar signature of Ernst Teufel, with the idiosyncratic feature of the "T" written as the numeral "7". (Tr. 210) Schaefer admitted that he had never seen a card similar to Government's Exhibit 6, although he also testified that everyone at Trawniki had his photograph taken in the summer of 1942 and that the white rectangle on the chest of the subject photographed in Government's

Exhibit 6 bore the identification number (not visible to the naked eye on either Govt's Exs. 6 or 6(b)[9]) of the particular soldier. (Tr. 229–230; 197–198)

Finally, the Government offered the testimony of Gideon Epstein, an expert forensic documents examiner and specialist in the examination of questioned documents. (Tr. 122–126) Epstein initially conducted his tests on the photographic copies of the Trawniki card (Govt. Exs. 5 and 6) and later conducted the same tests on the original document when it became available. Two different tests were conducted by Epstein. First, the signature of Karl Streibel on Government's Exhibit 5 and the signature of Ernst Teufel on Government's Exhibit 6 were examined and compared with known signatures of the same men. (Govt. Exs. 7, 8; Govt. Ex. 12) Epstein concluded that the signatures of Streibel and Teufel on Government's Exhibits 5 and 6 were authentic. (Tr. 132–133) Second, Epstein conducted an examination of Exhibits 5 and 6 to determine whether the documents had been altered or obliterated in any material way. Again, Epstein concluded that the documents had not been altered. (Tr. 151; 153)

Epstein conducted the same tests on the original Trawniki identification card when it became available and confirmed his previous conclusions. (Tr. 903) The only difference noted between the original Trawniki identification card and Exhibits 5 and 6 was that the left side of the original contained handwriting which had been blocked off the photographic copy (compare Govt. Exs. 5 and 5(b)[10]).

In the course of examining the original document, Epstein also studied the signature, "Demjanjuk" which appears on the lower right side of Government's Exhibit 6.

---

**9.** Microscopic analysis of the original Trawniki card revealed three of the four numbers that appear on the white rectangle on Government's Ex. 6, and these are 1?93. (Epstein, Tr. 903) The identification number on the other side of the card, Government's Ex. 5, is 1393.

**10.** A cursory examination of Exhibits 5 and 6 reveals handwriting interlineated between the German type. This handwriting is in Russian

and is a Russian translation of the printed matter. (Tr. 912) Epstein opined that the Russian handwriting was probably done by the same person (Tr. 901) and a translation of the Russian writing on the left side of Government's Exhibit 5(b) reveals that a Russian translator entered the interlineations in 1948. (*See* Govt. Ex. 5(a)(i))

(*See* Govt. Ex. 6(c)) This signature was compared with known signature exemplars of the defendant. Epstein was unable to reach any definitive conclusions as to the common authorship of these signatures, because the signature on Government's Exhibit 6 is written in the Cyrillic alphabet (Tr. 1111), and Epstein lacked a comparable known signature of the defendant in the Cyrillic alphabet with which to compare the signature on Government's Exhibit 6. (Tr. 904–905) Defendant denies that the signature on Exhibit 6 is his. (Tr. 111; 1117)

Personal information of the defendant found on Government's Exhibit 6 perhaps most compellingly indicates defendant's presence at the SS training camp of Trawniki. Government's Exhibit 6 contains defendant's name, birthdate (April 3, 1920), father's name (Nikolai), birthplace (Dub Macharenzi)[11], and nationality (Ukrainian). In addition, under the line "special features" is written "scar on back." Defendant has admitted that he was wounded in the back by shrapnel early in the war as a Russian soldier. Other personal attributes, though disputed by the defendant, are corroborated by defendant's sworn statements in his application for an immigration visa (Govt. Ex. 21). Government's Exhibit 6 lists defendant's hair as dark blonde and his eyes as grey. The defendant testified that his eyes are blue and that in 1942, the year in which the Government alleges defendant was at Trawniki, his hair color was light blonde. (Tr. 1074–1075). Defendant's application for immigration visa, December 27, 1951, however, lists defendant's eyes as grey and his hair as brown. (Govt. Ex. 21)

Finally, the photograph found on Government's Exhibit 6, in the opinion of the Court, clearly reflects the facial features of the defendant.[12] The defendant did not definitely deny that Government's Exhibit 6 contained a photograph of him. Rather, his response was equivocal in nature:

"Q. And as to Government's Exhibit 6, the photograph on there, is that a photograph of you?

"A. I cannot say. Possibly it is me.

"Q. Well, why can't you be sure?

"A. Because I never had such hair as the man in the photograph except in the Russian army.

"Q. Then if the photo is yours, it would have to have been during an era that you were in the Russian Army?

"A. Yes."

(Tr. 1076). The Court specifically finds that the photograph on Government's Exhibit 6 is that of the defendant.

On the basis of all the evidence reviewed above, the Court concludes that Government's Exhibits 5 and 6 are authentic and clearly show that defendant was at the German SS training camp of Trawniki.[13]

Neither Exhibit 5 nor Exhibit 6 contains a date as to when the card was issued, and therefore it is not certain when defendant was at the Trawniki camp. The Government did adduce evidence, however, from which an approximate date for the card may be ascertained. First, it was noted by Dr. Scheffler that the Trawniki card would have to have been issued during the period July 1941–July 1942, since the appellation "Representative of the Reichsfuhrer-SS for the Establishment of SS and Police Headquarters in the New Eastern Territory" was only utilized in this limited period. (Tr. 23)

A more exact date for the issuance of the Trawniki card was suggested by other evidence introduced by the Government. Government's Exhibit 6 was signed by

---

11. Government's Exhibit 6 lists defendant's place of birth as Dub Macharenzi, Saporosche. The inclusion of the district, Saporosche is apparently erroneous. (Tr. 1116–1117)

12. Assuming, as the government contends, that defendant was at Trawniki in 1942, defendant would have been 22 years old when the photograph on Government's Exhibit 6 was taken.

13. As indicated above, the defendant failed to introduce any evidence which challenges the authenticity of the Trawniki card. Although the original card was made available to the defendant for the purpose of expert documents analysis, no such analysis was conducted. The defendant has denied ever being at Trawniki or ever being issued a document like the Trawniki card. (Tr. 1076)

Ernst Teufel, rank, SS Rottenfuhrer. Government's Exhibit 9 corroborates this fact; it is a German war document suggesting the decoration of certain enlisted men, dated March 10, 1942, and issued by the German SS for the District of Lublin. The list of names contains that of Ernst Teufel, stationed at Trawniki, holding the rank of SS Rottenfuhrer. (Tr. 30–32) Government's Exhibit 10 is an allowance or salary chart card from the German SS personnel files in Berlin for Ernst Teufel. Item six of Teufel's card shows that he was promoted to the rank of SS Unterscharfuhrer on July 19, 1942. The rank of SS Unterscharfuhrer was the next advancement from the rank of SS Rottenfuhrer in the German army. (Tr. 32–34) It is therefore likely, based on Government's Exhibit 10, that Teufel signed the Trawniki card, Government's Exhibit 6, prior to July 19, 1942.

The Court previously concluded, based on expert testimony and other adduced evidence, that defendant was captured by the Germans in May 1942, and probably transferred from the Crimea to the POW camps of Rovno and Chelm sometime in May-June 1942. Following his incarceration at the POW camps, it now appears that defendant was transferred to the SS training camp at Trawniki sometime during the summer of 1942, prior to July 19, 1942.

The Government next contends that defendant was transferred from Trawniki to the extermination camp of Treblinka, Poland, in the fall of 1942. The defendant asserts that he never served the Germans as a guard in any concentration camp. (Tr. 1116) The Government produced six eyewitnesses from Treblinka, five Jewish survivors and a German guard who identified the defendant from photographs as the man known to them simply as Ivan,[14] the operator of the camp gas chambers, and a man who killed, beat, and abused Jewish prisoners at Treblinka.

## B. Treblinka

The extermination camp of Treblinka was located in the district of Warsaw, Poland, and operated from July 1942 until August-September of 1943. (Tr. 98A; 123A) As indicated previously, Treblinka was part of the overall plan of Action Reinhard and it is an historical fact that former Russian POWs, often Ukrainians, were trained at Trawniki and later sent to serve at the concentration camp of Treblinka.[15] (Scheffler, Tr. 118A–125A)

The ghoulish, diabolical operation of Treblinka, resulting in the almost incomprehensible annihilation of 900,000 Jews (Tr. 126A) is indelibly stamped on the human conscience, and unfortunately is now a part of the human experience.[16] Certain aspects of the topography of Treblinka are relevant in the instant action. The death camp at Treblinka was divided into two parts, referred to as camp 1 and camp 2. (Govt. Ex. 15; Tr. 587–588) Camp 1, or the lower camp, was the "receiving" area for the transports of Jewish prisoners who were brought by sealed railroad cars to Treblinka. The upper camp, or camp 2, contained two gas chambers, a large facility with ten chambers and a smaller facility with three chambers. The burial pits for the exterminated bodies were located in camp 2 in close proximity to the gas chambers.

The Government called five surviving Jewish prisoners from Treblinka who testified at trial: Chil Rajchman, Elijahu Rosenberg, George Rajgrodzki, Sonia Lewkowicz, and Pinhas Epstein. In addition, the Government produced the videotape testimony of Otto Horn, a German guard at Treblinka, who was tried and completely exonerated for his activities at Treblinka in

---

**14.** The Russian proper name, Ivan, and its Ukrainian analogue, Iwan, are very common names, being the English equivalent of John. They will be used interchangeably in this decision.

**15.** In *Fedorenko*, the defendant admitted that he had received training at Trawniki and then was transported to Treblinka in September

1942 where he served as a guard. *U.S. v. Fedorenko*, 455 F.Supp. 893, 901 (S.D.Fla.1978)

**16.** A description of the grotesque *modus operandi* at Treblinka may be found in *U.S. v. Fedorenko*, 455 F.Supp. 893, 901 at n. 12 (S.D.Fla. 1978).

Germany in 1965. (Tr. 330) It is extremely important to note that all these witnesses were located for extensive periods of time in camp 2, the upper camp. Rajchman, Rosenberg, Rajgrodzki, and Epstein all shared the grim task of transporting dead bodies to the burial pits. (Tr. 421–422; 511–512; 580–581; 643) This work brought them in close proximity to the gas chambers. Sonia Lewkowicz worked in the kitchen and laundry of camp 2 directly behind the gas chambers. (Tr. 633) Otto Horn, classified as a male "nurse" in the German military, was assigned to duty in camp 2 supervising the Jewish prisoners as they burned corpses and worked near the pits. (Tr. 385)

Each of the witnesses recalled a Ukrainian named "Ivan" [17] who not only herded the Jewish prisoners into the gas chambers, but also activated the motors which gassed the Jews. (Tr. 306–307; 426; 514–515; 581; 633; 651–652) The savage cruelty of this notorious man earned him the special nickname among the camp's Jewish inmates, "Ivan Grozny" or "Ivan the Terrible." The duties which each witness performed at Treblinka should be examined in some detail because such examination is relevant to the credibility of the photographic identifications made by these witnesses.

Otto Horn was assigned to Treblinka in late October 1942 and was stationed in camp 2, until early September 1943, supervising the Jewish prisoners as they burned corpses and shoveled earth into the burial pits. (Tr. 385) Horn testified that Ivan was always present at the gas chambers (Tr. 306), that "he was Schmidt's right hand" [18] and enjoyed especially good terms with the German officers at the camp. (Tr.

308–309) Horn unequivocally testified that he had seen Ivan inside the gas chambers, directing the prisoners into the chambers and later operating the engines that sent the fatal gas into the chambers. [19] (Tr. 325–330) Horn was the only witness who testified that he had never seen Ivan commit any other atrocities while at Treblinka. (Tr. 398)

Chil Rajchman, the first of the Jewish survivors to testify, entered Treblinka in October 1942 and after three days was assigned to camp 2, first as a carrier of the dead corpses and later as a "dentist." [20] (Tr. 421–403) Rajchman remained in camp 2 until August 1943. [21] Rajchman identified Ivan as the man who operated the gas chambers. (Tr. 426) He witnessed a particular incident in which Ivan used a wood drill to torture one of his friends. (Tr. 426) Other atrocities perpetrated by Ivan were personally witnessed by Rajchman. (Tr. 427) It was noted that the barracks where the Jewish prisoners were confined in camp 2 afforded a clear view of the small gas chambers and Ivan's presence nearby. (Tr. 489)

Elijahu Rosenberg also entered Treblinka in the fall of 1942 and was soon assigned to camp 2 where he served as a corpse carrier for a few weeks. (Tr. 510; 512) After this, he was chosen to work inside the gas chambers removing the bodies after a gassing. Rosenberg testified that he saw Ivan at the gas chambers whenever more Jewish prisoners arrived. (Tr. 515) Ivan beat and tortured the incoming prisoners, herded them into the gas chambers, and then activated the destructive motors. (Tr. 515) He related other atrocities committed by Ivan which he had witnessed. (Tr. 516)

---

17. The fact that the survivors of Treblinka remember this man only as "Ivan" or "Iwan" is not especially surprising. Testimony revealed that the Jewish inmates knew their captors only by nickname or proper name; a closer social familiarity might easily have led to death.

18. Schmidt was a German officer in charge of the gas chambers. (Tr. 306)

19. Horn specifically marked a map of Treblinka indicating where he saw Ivan working inside

and outside the gas chambers. *See* Government's Exhibit 1 attached to deposition of Otto Horn, February 26, 1980 and Tr. 325–327.

20. Rajchman was responsible for extracting valuable dental work from the mouths of the dead.

21. The latest any of these witnesses was at Treblinka was August 2, 1943. On this day the Jewish prisoners revolted and some escaped.

George Rajgrodzki entered Treblinka in September 1942 and worked as a corpse carrier in camp 2 from September through the end of November 1942. (Tr. 580) After this, Rajgrodzki worked in the kitchen of camp 2 for the rest of the time of his incarceration at Treblinka. Rajgrodzki, like all the body carriers, was often in the area of the gas chambers. (Tr. 582) The witness related that Ivan once gave him twenty lashes for being late for roll call. (Tr. 582) Rajgrodzki also recalled that Ivan once came over to the prisoners' barracks to hear him play the violin. (Tr. 584) In summary, Rajgrodzki testified that he had ample opportunity to view both Ivan, and another Ukrainian, Nikolai, who operated the gas chambers:

> "I had plenty of opportunity to see them; for instance, by the gas chamber, sometimes one and sometimes, the other. I saw them in the area where we were carrying the corpses. I even was aware of them herding people in from the other side . . . ."

(Tr. 592)

Sonia Lewkowicz was incarcerated in Treblinka from December 1942 until August 1943. On March 5, 1943, Lewkowicz was assigned to work in the kitchen and later the laundry of camp 2 where she remained for the rest of her time at Treblinka. (Tr. 611) Mrs. Lewkowicz's work was in proximity to the gas chambers:

> "Q. Mrs. Lewkowicz, how often were you actually in the area of the gas chambers?
>
> "A. I was there many times. I was at the place where I hung the laundry. This was behind the gas chambers. I went there to hang up the laundry and to take off the laundry.
>
> "Q. Were you ever there during the time there were gassings going on?

> "A. One time when I was hanging the laundry there were people inside the gas chambers and I heard terrible screams from the gas chambers.
>
> "Q. But only on this one occasion; is that correct?
>
> "A. One and only one."

(Tr. 633) Lewkowicz testified that a Ukrainian named Ivan activated the gas chambers. (Tr. 611)

Finally, Pinhas Epstein testified that he was in Treblinka from September 1942 until August 1943. Epstein also served most of his time in camp 2 as a corpse carrier (Tr. 643) affording him a clear view of the gas chambers:

> "Q. Have you ever had occasion to be present when the motors to the gas chambers were turned on?
>
> "A. Yes, sir.
>
> "Q. Were you able to see this area clearly, the area where the motors were?
>
> "A. Yes, sir.
>
> "Q. And do you know who operated the motors?
>
> "A. The motors were activated by two Ukrainians; one was Iwan and the second was Nikolai."

(Tr. 651) Epstein also testified about other atrocities he saw Ivan commit. (Tr. 653)

### C. Photographic Identifications

The evidence linking the defendant with this notorious Ivan at Treblinka are the photographic identifications made by the six witnesses both before trial and at trial. No in-court identification was attempted by either the Government or the defendant. All the pretrial photographic identifications except for Rajchman's were conducted overseas.[22] Several different photospreads were shown individually to each of the witnesses by different investigators on various dates.[23] Two photographs of the defendant

---

22. Rajchman viewed the photospreads in New York; Horn in West Berlin; Rosenberg, Rajgrodzki, Lewkowicz, and Epstein in Israel.

23. Horn was shown photospreads by American officials initially on November 14, 1979, and later at his videotaped deposition on February

26, 1980. American officials also showed Rajchman photospreads on March 12, 1980. Israeli authorities were responsible for conducting the pretrial photo-identifications with the remaining witnesses on the following dates: Rosenberg (May 11, 1976; December 25, 1979); Rajgrodzki (May 1978); Lewkowicz (March 15,

were utilized in these identification sessions. Each witness was shown a photospread containing a picture of the defendant taken from his 1951 application for an immigration visa. The defendant at this time was thirty one years old. Each witness picked out defendant's visa photograph and identified defendant as the man known as Ivan at Treblinka. In addition to the visa picture, five of the six witnesses were also shown another photospread containing the picture of the defendant found on the Trawniki card, Government's Exhibit 6.[24] Four of those witnesses picked out the photograph from the Trawniki card and again identified defendant's picture as that of Ivan. The fifth witness, Rajchman, failed to identify defendant's Trawniki picture on Government's Exhibit 6 in a pretrial confrontation, but did so at trial. A review of the photographic identification testimony of each witness follows.

Otto Horn viewed two photospreads which were only shown to Horn and to none of the other witnesses. (*See* Government's Exhibits 2 and 3 attached to the deposition of Horn, February 26, 1980). Each of the photospreads contained eight separate photographs. Prior to his videotaped deposition, Horn in succession picked out both defendant's visa picture and the Trawniki photograph and identified defendant as the Ivan he knew who worked at the Treblinka gas chambers. (Tr. 310–317) Later, at his videotaped deposition, Horn once again picked out the same photographs and made the same identification. (Tr. 318–324) The Court finds no aberrations in the conduct of these identifications which may be said to detract from the identifications Horn made.

Rajchman viewed Government's Exhibit 16 containing eight separate photographs, including defendant's visa picture. At the pretrial identification, Rajchman was asked whether he recognized anyone from Treblinka. Rajchman looked through the pictures, picked out defendant's visa photograph and stated: "I believe this is a pic-

ture of the Ukrainian Ivan." (Tr. 428–430) Rajchman selected the same visa photograph of the defendant at trial. At the pretrial identification, Rajchman was also shown Government's Exhibit 19, a photospread consisting of eight separate photographs, including defendant's Trawniki picture. Rajchman failed to identify defendant on the basis of the Trawniki photograph. (Tr. 487) However, when defense counsel allowed the witness to examine the photographs of Government's Exhibit 19 at trial, Rajchman picked out the Trawniki photograph and identified defendant as the Ivan he knew from Treblinka. (Tr. 482–483)

In 1976 Rosenberg was shown a photo album, Government's Exhibit 17, and was asked to identify people who were at Treblinka. (Tr. 517) Government's Exhibit 17 consists of forty-three photographs, of various size and quality, numbered and affixed to cardboard pages. The defendant's visa photograph, # 16, is found on the third page. Rosenberg testified that he looked through all the photographs, although a statement made at the time of the investigation indicates that he was shown seventeen photographs, presumably the first seventeen photographs in the album. (Government's Exhibit 29(a)) Rosenberg identified photograph # 16, defendant's visa photograph, as that of Ivan:

"Q. Now, at the time could you be certain of your identification?

"A. I was certain, but I left myself a little leeway on the possibility so that I did not say 100 percent; but, in my heart, I saw his appearance, the build of his head, and inside of me I was certain that that was him."

(Tr. 519) Rosenberg stated that his only hesitation was that the picture made defendant look more mature than he remembered Ivan to be at Treblinka. This, of course, is an accurate observation, since the

1978; December 27, 1979); Epstein (March 29, 1978; December 25, 1979)

24. Rajgrodzki was not shown the photograph of defendant found on the Trawniki card, Government's Exhibit 6.

visa photograph represents the defendant at age thirty-one, whereas in 1942 defendant would have been twenty-two years of age.[25] When the investigator told Rosenberg that according to her knowledge, the man he had chosen was not at Treblinka, Rosenberg reiterated: "I'm identifying him, he was in Treblinka; he resembles very much a Ukrainian whose name is Ivan." (Tr. 519)

Three years later, Rosenberg was shown Government's Exhibit 19, a photospread consisting of eight photographs, including defendant's Trawniki photograph. (Tr. 523) Rosenberg was told to point out the picture of the man known to him as Ivan, and he selected defendant's Trawniki photograph.[26] Rosenberg later identified both defendant's visa picture in Government's Exhibit 17 and the Trawniki photograph from Government's Exhibit 19 at trial.

Rajgrodzki was only shown a photospread containing defendant's visa photograph, Government's Exhibit 17. Rajgrodzki testified that at the pretrial identification, he looked through the entire photo album of forty-three pictures and identified defendant's visa photo as the "Iwan who was in camp 2" at Treblinka. (Tr. 586) Subsequently at trial, the witness again identified defendant's visa photograph.

The pretrial identifications conducted before Mrs. Lewkowicz were initiated in 1978. Mrs. Lewkowicz was shown the photo album, Government's Exhibit 17, containing defendant's visa photograph. The witness testified that she leafed through the album from beginning to end, although a statement prepared at the time suggests the possibility that the witness viewed only the page containing defendant's visa photograph and seven other photographs. (Defendant's Exhibit BBB) Mrs. Lewkowicz selected defendant's visa photograph and identified him as the Ivan she knew from the Treblinka gas chambers. (Tr. 613) A year later Mrs. Lewkowicz was shown the eight photographs in Government's Exhibit 19 and she selected and identified the defendant's Trawniki photograph. (Tr. 615) Mrs. Lewkowicz identified the same photographs in both photospreads at trial.

Finally, Pinhas Epstein was shown the photo album, Government's Exhibit 17, in 1978. Epstein testified that he looked through the album, although, again, a statement made at that time reflects the possibility that only eight photographs were then viewed. (Defendant's Exhibit CCC) The witness unequivocally selected the defendant's visa photograph as the Ivan he knew from Treblinka:

> "The witness points to Photo 16 and says: The person shown here reminds me a lot of Ivan. The picture is not completely in focus. The age differential also must be taken into account. The general shape of the face, especially the curvature of the forehead strengthen may [sic] opinion that it is Ivan. The short neck is characteristic on the broad shoulders-exactly what Ivan looked like."

(Defendant's Exhibit CCC) A year later, Epstein was shown the eight photographs that comprise Government's Exhibit 19 and once again he selected and identified defendant's Trawniki photograph. (Tr. 657) Both photographic identifications were later verified at trial.

■ Defendant seeks to exclude evidence of the eyewitness photographic identifications on two grounds. The first ground is more easily disposed of. Defendant contends that the conduct of post-complaint photographic identifications outside the presence of defense counsel violated his fourteenth amendment guarantee to due process of law. Denaturalization proceedings are civil in nature although due to the valuable right of citizenship sought to be withdrawn, the Government must establish its allegations by evidence that is clear, convincing and unequivocal. *Schneiderman v. United States*, 320 U.S. 118, 63 S.Ct. 1333,

---

25. *See also* corroborating statement taken by the investigator at this time, Government's Exhibit H.

26. *See also* corroborating statement taken by the investigator at this time, Government's Exhibit 30(a).

87 L.Ed. 1796 (1943). The Supreme Court has held that in criminal proceedings an accused does not have a Sixth Amendment right to have counsel present when the Government conducts a post-indictment photographic identification proceeding. *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973) Certainly the mere absence of counsel during the identification proceedings cannot be said to have denied defendant due process of law. Our legal system has always placed primary reliance for the ascertainment of truth on the "test of cross-examination" and effective cross-examination can be utilized to reveal any deficiencies in photographic identification procedures. Defendant conducted rigorous cross-examination of all six witnesses concerning the pretrial identification proceedings in this case. This adversary mechanism adequately compensated for the absence of defense counsel at the pretrial identification proceedings.

The defendant also argues for the exclusion of the pretrial and in-court identification testimony of four witnesses: Rosenberg, Lewkowicz, Epstein, and Rajgrodzki. It is defendant's contention that the pretrial photographic identifications of these witnesses were so conducive to mistaken identification as to deny defendant due process of law.

The Supreme Court has observed in criminal cases that the reliability of an eyewitness identification at trial following a pretrial identification must be evaluated in light of the totality of circumstances in each individual case. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Unnecessary suggestiveness alone does not require exclusion of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 55 L.Ed.2d 140 (1977) The focus is on the reliability of the witnesses' identification rather than on the flaws in the pretrial identification procedures. The Court has posited a list of factors to be considered in evaluating the reliability of questioned pretrial identifications:

"As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

*Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

Two courts confronted with denaturalization proceedings similar to the instant case have relied upon these general parameters which the Supreme Court developed in the context of criminal prosecutions. *United States v. Fedorenko*, 455 F.Supp. 893, 905 (S.D.Fla.1978); *United States v. Walus*, 453 F.Supp. 699, 712 (N.D.Ill.1978), *rev'd* 616 F.2d 283 (7th Cir. 1980). The Court believes reliance on such general guidelines is proper, although the conventional criminal matrix from which these guidelines originated does not approximate the exceptional circumstances presented in the instant litigation. For example, in *Neil v. Biggers, supra*, the defendant was convicted of rape on evidence that consisted in part of testimony concerning the victim's identification at a police lineup that occurred seven months after the rape. The Court opined: "There was to be sure, a lapse of seven months between the rape and the confrontation. This would be a seriously negative factor in most cases." *Id.* at 201. In the present case, the length of time between the events in question and the witness identifications is an extraordinary 34–35 years. Such a lengthy duration of course imposes on the Court a duty to scrupulously examine the eyewitness identifications offered in this case. However, the Court feels that a Procrustean application of the specific guidelines for testing photographic identifications in more conventional criminal prosecutions is unwarranted in the present case. Careful consideration of the Supreme Court precedents in this area reveals that the central consideration is the reliability of the identification in light of all the circum-

stances. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 55 L.Ed.2d 140 (1977). The Court concludes from the totality of facts in this case that the six eyewitness identifications of defendant as the "Ivan" known from Treblinka are reliable.

Defendant first argues that the photo album, Government's Exhibit 17, shown to Rosenberg, Lewkowicz, Epstein and Rajgrodzki is inherently suggestive and created a substantial risk of misidentification of the defendant.[27] It will be recalled, that Rosenberg viewed a minimum of seventeen photographs from this album, Rajgrodzki all forty-three photographs, Lewkowicz a minimum of eight photographs, and Epstein also a minimum of eight photographs, before the pretrial identifications were made.

Government's Exhibit 17 consists of forty-three black and white photographs of varying size and quality, affixed to ten cardboard pages. The defendant's visa picture, # 16, is located at the bottom left of the third page along with seven other photographs on the page. Photograph # 17 directly to the right of defendant's photograph is that of Fedor Fedorenko, the defendant in *U.S. v. Fedorenko*. Defendant argues that this page is suggestive for several reasons. First, defendant's photograph was placed next to that of Fedorenko who was the only other person other than the defendant of the forty-three individuals depicted in the photospread suspected of being at Treblinka. Next, defendant observes that photographs # 16 and # 17 are larger than the other photographs on the page and that the visual images on these pictures are clearer than those of the other pictures on the page. It should be noted that over half the other photographs in the album are as large or larger than photographs # 16 and # 17 and share comparable visual quality.

The Court concludes that whatever suggestiveness may be present on the page containing defendant's photograph in no way tainted the identifications of Rosenberg and Rajgrodzki. Both witnesses looked at a sufficient number of photographs of size and quality comparable to those found on the page containing defendant's photograph and both witnesses selected defendant's visa photograph with unequivocal certainty. The identifications of Lewkowicz and Epstein were similarly positive and unequivocal. However, the possibility that the alleged suggestive characteristics contributed to these identifications is heightened by the fact that, at a minimum, both witnesses may have viewed only the page containing defendant's photograph. Nonetheless, the Court does not find it necessary to determine the effects of the suggestiveness as unnecessary suggestibility alone does not require exclusion of the identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) An examination of the "totality of circumstances" in this case reveals the reliability of not only the identifications of Lewkowicz and Epstein, but also of the remaining witnesses.

It is uncontroverted that each of the witnesses had ample opportunity to view the individual known to them as "Ivan" at Treblinka. Each witness was stationed for extensive periods of time in camp 2 in close proximity to the gas chambers where Ivan worked. In addition, Rajchman, Rosenberg, and Epstein testified that they personally observed this individual commit atrocities at the camp. Rajgrodzki testified that Ivan once whipped him.

Thorough cross-examination of each witness failed to depreciate in any way the certainty of the identifications made by each witness. Each witness identified defendant as the Ivan known from Treblinka on the basis of defendant's visa photograph. In addition, four of five witnesses shown defendant's picture on the Trawniki card identified him. The fifth, Rajchman, who failed to select the photograph at a pretrial session did so in open court. There is no indication that the investigators conducting

---

27. The Court is aware that this same photo album was subjected to scrutiny in *U.S. v. Fedorenko*, 455 F.Supp. 893, 906 (S.D.Fla.1978) and was deemed impermissibly suggestive. The photospread was compiled by Israeli police and contains photographs of individuals against whom war crime accusations have been made. (Tr. 1153)

the identification procedures in any way suggested the identification of defendant's photographs. Nor is there any indication that world wide media coverage of this case containing alleged photographs of defendant prejudiced the identifications made by any witness.

Finally, in identifying defendant as "Ivan" each of the witnesses offered a physical description of the Ivan they observed which is consistent with that of the defendant. Admittedly, these descriptions were given by the witnesses after they had viewed the photospreads. Comparison of the testimony reveals a few particular discrepancies but it may be fairly said that the following general description was offered by all the witnesses: young man, 22–25 years of age, tall, strong physique, dark or dark blonde hair.[28] The witnesses testified that the uniform worn by this individual was either black or dark brown. The use of both color types at Treblinka is likely.[29] It is important to note that several witnesses recalled features of Ivan which correspond to those of defendant and which are not recognizable from the photographs. For instance, Rosenberg correctly testified that Ivan's eyes were "grey" and Lewkowicz described Ivan's eyes as "light". (Tr. 535; 625) Rajgrodzki and Lewkowicz testified that Ivan's hair was dark blonde, which is the color indicated by the Trawniki card, Government's Exhibit 6. (Tr. 595, 633)

Defendant offered the testimony of one witness, Fedor Fedorenko, who was present at Treblinka during the years 1942–1943 as a Ukrainian guard. (Deposition of Fedor Fedorenko, March 7, 1981) Fedorenko was shown both defendant's Trawniki photograph and visa photograph and denied ever seeing the defendant at Treblinka. The Court finds that the testimony of Fedorenko is not credible. Fedorenko testified at his own trial that an "Ivan" operated the motors of the gas chambers. (Fedorenko Trial Transcript at pages 1458–59) However, at his deposition, Fedorenko claimed that he did not know such an Ivan or remember his appearance. (Deposition at pages 17–18; 22–23; 62–63; 66) Fedorenko also testified that he was never in camp 2 at Treblinka or near the gas chambers. (Deposition at page 38) If this statement is accurate, Fedorenko would not have had the opportunity to observe the individual known as Ivan and so his failure to identify defendant's photographs is not surprising.[30]

In conclusion, based on an examination of all the factual circumstances the Court finds that none of the pretrial photographic identifications was so impermissibly suggestive as to give rise to a likelihood of misidentification and deny defendant due process of law. Since the Court finds both the pretrial and trial photographic identifications to be reliable, it must conclude that defendant was present at Treblinka in 1942–1943.[31]

### D. Defendant's Testimony

Defendant has denied ever serving the Germans as a guard at Trawniki, Treblinka, or any other location in 1942–1943. Defendant testified that after being captured by the Germans in the Crimea, he was

---

**28.** Horn, Tr. 307–308; Rajchman, Tr. 473–475, 495; Rosenberg, Tr. 515–535; Rajgrodzki, Tr. 595–599; Lewkowicz, Tr. 612–625; Epstein, Tr. 653.

**29.** Dr. Scheffler testified that the guards at Trawniki received black uniforms originally and these were replaced later on by khaki or earth brown uniforms. (Tr. 116A) *See also* testimony of Schaefer (Tr. 192)

**30.** The cross-examination of this witness revealed numerous inconsistencies which further detracted from his credibility.

**31.** Because the Court has found that defendant was present at both Trawniki and Treblinka, it is not necessary to determine whether defendant was ever present at the concentration camp of Sobibor, Poland. Government's Exhibit 6 shows that the defendant was detailed to Sobibor on March 27, 1943, but the circumstances and duration of this transfer are unknown. There was no eyewitness testimony presented that defendant served at Sobibor, although defendant stated on his application for immigration visa (Government's Exhibit 21) that he was in Sobibor from 1934–1943, working as a farmer. Defendant now admits that he lied on his visa application and claims that he was never at Sobibor during this period.

taken first to a POW camp at Rovno, in the Western Ukraine sometime in 1942 or 1943. (Tr. 1068) From Rovno, defendant indicates he was taken to a POW camp at Chelm, Poland, and remained here "until about 1943 or 1944." (Tr. 1069) The defendant testified that in 1944 he was transported to Graz, Austria, where he remained for three or four weeks. (Tr. 1069–1071) At Graz, defendant admitted that he was placed in a unit of the Ukrainian National Army, commanded by a General Shandruk, and organized by the Germans for later service against the Russians. (Tr. 1095–1096) According to defendant, although he was drilled in a unit, he never received a gun and never engaged in any military action while at Graz. (Tr. 1071; Deposition of February 20, 1980, at 66) While at Graz, defendant admitted that he received a blood group tattoo on the inside of his upper left arm. (Tr. 1070)

Defendant testified that he was transferred from Graz to a location known to him as Oelberg, Austria. (Tr. 1071) Defendant was uncertain as to the correct spelling of this location and neither the defendant nor the Government could locate an "Oelberg" in Austria. Nevertheless, defendant testified that he remained at Oelberg from approximately November 1944 until May 1945.[32] Defendant stated that he was placed by the Germans in a Russian National Army unit assigned to guard a captured Russian general. (Tr. 1099–1103) Aside from this duty, defendant claimed he engaged in no other military action. Finally, the defendant testified that he cut off the blood group tattoo he received at Graz while at Oelberg since "tattoos weren't given in the Russian National Army." (Tr. 1105–1106)

The credibility of defendant's testimony is severely undercut by the existence of Government's Exhibits 5 and 6 and the testimony of the other six Treblinka survivors which cumulatively show that defendant was present at Trawniki and Treblinka in 1942–1943. The Government attacked the credibility of defendant's testimony in several other ways. Expert testimony revealed that it was unlikely defendant was at a POW camp in Chelm, Poland, in the fall of 1944 as his testimony would indicate since the Russians had driven the Germans from Chelm by July 1944.[33] (Ziemke, Tr. 1129–1132) Expert testimony also revealed that General Shandruk, the general defendant claimed commanded the Ukrainian National Army at Graz in 1944, was not designated as the general of the Ukrainian National Army until March 1945. (Tr. 1134–1136)

Finally, defendant's admission that he had a blood group tattoo on the inside of his left arm raises serious questions. Only persons affiliated with the German SS were given such tattoos and it is unlikely that ordinary Russian POWs would be so marked. (Scheffler, Tr. 36–38) The International Refugee Organization (IRO), an agency established by the United Nations after the war to process thousands of displaced persons, recognized the significance of such tattoos, presumably because they would disqualify an individual from receiving any IRO assistance:

> "1. Tattooings. Tattooings which will be of value to the Field Eligibility personnel will fall normally in three categories which will be described below. The Nazi Government as a result of its desire to categorize as far as possible all of its manpower, instituted the system of tattooing whereby the elite could be differentiated from the normal personnel as well as from the undesirable.
>
> "2. The various tattooing marks and their purposes were as follows:
>
> .   .   .   .   .

---

**32.** This chronology is derived from defendant's testimony that he was at Oelberg from 1944 until the week before the end of the war. (Tr. 1097) Germany surrendered to the Western Allies and Russia on May 8, 1945.

**33.** According to the testimony of Dr. Ziemke, the latest possible period during which the Germans would have kept a POW camp at Chelm, Poland was January 1944.

(b) Members of the S.S. and the Waffen S.S. were tattooed with a blood mark underneath the left armpit. This blood group mark matched the blood group mark to be found on the S.S. persons [sic] filed at the S.S. Headquarters in Berlin. Again, whether or not an individual Waffen S.S. member had a blood group mark depended on the exigencies of the war and whether the facilities were available for tattooing. Frequently it occurred that persons who were conscripted in the latter days of the war were not tattooed because of the chaotic situation at the time." [34]

The Government argues that such a tattoo is additional evidence that defendant served the German SS at Trawniki and Treblinka. The Court, being unable to determine the accuracy of the Government's argument with certainty, must nevertheless observe that evidence of the blood group tattoo raises a final, serious doubt about the defendant's testimony concerning his whereabouts during the war.

It is undisputed that following the war, defendant was taken by American forces to several camps and eventually he arrived in Regensburg, Germany, where he drove a truck in an American Army motor pool from 1947–1949. (Tr. 1073)

### E. Defendant's Immigration

It is necessary to review briefly postwar immigration procedures which are pertinent to this action. Following the conclusion of the war, the Allied armies became the guardians of about 8,000,000 persons including those liberated from extermination camps, former prisoners of war, and thousands of other persons dislocated by the hostilities. By 1948, 7,000,000 of these uprooted persons had been repatriated leaving approximately 1,000,000 persons in the United States, British, and French zones of Germany, Austria and Italy. S.Rep.No.950,

80th Cong., 2d Sess., U.S.Code Cong. Service 2028, 2035 (1948). Many of these people lived in camps operated by the International Refugee Organization (IRO), an organization founded in 1946 to offer care and assistance to the dislocated masses and to provide for their eventual repatriation. Part two of Annex I of the IRO Constitution, 62 Stat. 3037, 3051 (1946) provided that certain persons would *not* be the concern of the IRO:

"1. War criminals, quislings and traitors.

"2. Any other persons who can be shown:

(a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or

(b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations."

. . . .

In 1948, Congress enacted the Displaced Persons Act (DPA) to enable European refugees driven from their homelands to emigrate to the United States. Section 2(b) of the DPA, 62 Stat. 1009, defined a displaced person eligible for emigration by incorporating the definition of "refugees or displaced persons" contained in Annex I to the IRO Constitution, *supra*. A person seeking a visa to the United States under the DPA normally followed a tripartite procedure.

First, a refugee filed an application for IRO assistance. The applicant was interviewed by an IRO eligibility officer who elicited information about the applicant's personal and family history, with especial emphasis on the war years, in order to determine whether the applicant was qualified under the IRO constitution, *supra*. (Tr. 700–702) The primary source of background information inevitably came from the applicant himself. If qualified, the refugee was granted IRO assistance.

---

**34.** *Manual for Eligibility Officers*, International Refugee Organization (IRO), at 115 (Govt. Ex. 1 attached to deposition of Daniel Segat, January 16, 1981) [henceforth IRO Manual]. Such a tattoo would be important as Annex I to the IRO Constitution, Part II, provided that persons who voluntarily assisted the enemy forces during the war would not be the concern of the IRO. 62 Stat. 3037, 3052 (1946)

Next, the refugee sought to qualify as an eligible displaced person under the DPA. The Displaced Persons Commission was the agency in charge of implementing the DPA. Under sections 2(b) and 10 of the DPA, 62 Stat. 1009, 1013, positive eligibility under the IRO was a preliminary requisite. The IRO file containing the history of the particular refugee and the certification of IRO status was forwarded to the Displaced Persons Commission. A case analyst then made certain security checks on the background of the applicant to determine eligibility under the DPA and issued a report certifying that the applicant was a person eligible for admission into the United States under the DPA. (Tr. 787–791)

Finally, the case analyst forwarded an applicant's file, containing both the preliminary IRO certification and the Displaced Persons Commission report to the appropriate American Consulate. The applicant appeared at the consular office and was matched with an interpreter-typist, who assisted the applicant in filling out the application for an immigration visa. A vice-consul at the American Consulate reviewed the visa application and other documents in the applicant's file. The vice-consul then interviewed the applicant and, at a minimum, reviewed with the applicant all the entries which appeared on the visa application. If the vice-consul determined that the applicant met the criteria of the DPA and other immigration laws, he issued the applicant a visa.[35] (Tr. 844–847)

In 1948 defendant initiated procedures to immigrate to the United States. He first applied for assistance to the IRO. In his IRO application (Exhibit 3 attached to defendant's deposition, February 20, 1980), defendant neither disclosed his service with the German SS at Trawniki and Treblinka, nor did he reveal, as he testified at trial, that he had served in a German military unit in 1944–1945. Questions 10 and 11 of the IRO application asked for defendant's place of residence and employment for the last twelve years. Defendant answered that from 1937–1943 he worked in Sobibor, Poland, and from 1943–1944 in Pilau, Germany. Defendant now admits that these statements were false. (Deposition of defendant, February 20, 1980, at 39)

In October 1950, defendant applied to the Displaced Persons Commission for consideration to immigrate to the United States. Defendant made the same misrepresentations, concealing his service with the German SS and the German military. Page three of the report issued by the Displaced Persons Commission, Government's Exhibit 20, concluded based upon the information furnished by the defendant that he had been a farmer at Sobibor, Poland from 1936 to 1943; worked at the harbor of Danzig, Germany from 1943 until May 1944; and worked in Munich, Germany from May 1944 to May 1945.[36]

Defendant filed his application for an immigration visa on December 27, 1951. (Government's Exhibit 21) Defendant admits he misrepresented under oath his whereabouts and activities during the war. (Tr. 1084–1086) Defendant listed his residences during the period in question as follows: 1934–1943 Sobibor, Poland; 1943-September 1944 Pilau/Danzig, Germany; September 1944-May 1945 Munich, Germany. In addition, defendant misstated his

---

**35.** Section 10 of the DPA was amended by § 9 of the Act of 1950, 64 Stat. 219, 225–226 (1950) to clearly allow the vice-consul to make the final determination of eligibility of applicants, both under the DPA and under the general immigration laws. Conference Report No. 2187, 81st Congress, 2d Sess., U.S.Code Cong. Service 2513–2523 (1950). Section 9 provided: "no person shall be issued an immigration visa or be admitted into the United States under this Act if the consular officer or the immigrant inspector knows or has reason to believe that the alien is subject to exclusion from the United States under any provision of the immigration laws or (1) is not a displaced person and an eligible displaced person, or (2) is not eligible under the terms of this Act ...."

**36.** The case analyst, Leo Curry, responsible for submitting this report for the Displaced Persons Commission testified on behalf of the Government at trial. (Tr. 779 *et seq.*)

birthplace as Kiev, U.S.S.R. and his nationality as Polish/Ukrainian.[37]

Defendant testified that he made these misrepresentations during his immigration to avoid being repatriated to the U.S.S.R. because of his prior service in the Russian army. (Tr. 1081–1082)

Defendant was granted a visa and entered the United States for legal residence on February 9, 1952.

### F. Defendant's Naturalization

Defendant applied to the Immigration and Naturalization Service (I.N.S.) for naturalization as an American citizen in 1958.[38] Defendant submitted his application to file petition for naturalization. (Government's Exhibit 25A) In processing defendant's application, the I.N.S. checked his immigration and visa file to verify that defendant's entry into the United States was lawful, as lawful entry is a prerequisite for naturalization. (Tr. 870–871; 885–886) An interview was conducted with defendant by a naturalization examiner on August 12, 1958, to review the contents of defendant's naturalization application. This interview was conducted under oath. At the time defendant again stated that the contents of his naturalization application were true, including his answer to question 23, in which he denied having given "false testimony for the purpose of obtaining any benefits under the immigration and naturalization laws."

On November 14, 1958, the United States District Court for the Northern District of Ohio, without knowledge of defendant's true activities and whereabouts during the war, naturalized the defendant. At his naturalization, defendant changed his first name from "Ivan" to "John."

37. The vice-consul who processed defendant's visa application, Harold Henrikson, testified on behalf of the Government at trial. (Tr. 839 et seq.)

38. Donald Pritchard, a former naturalization examiner in the Cleveland office of I.N.S. during the period in which defendant was naturalized, testified concerning the naturalization process. (Tr. 866 et seq.)

## CONCLUSIONS OF LAW

Section 340(a) of the Immigration and Nationality Act, 8 U.S.C. § 1451(a), provides that a naturalized citizen may be denaturalized if the naturalization was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation." The Government argues that defendant can be denaturalized under both standards.

### A. Citizenship Illegally Procured

■ Congress has been entrusted by the Constitution with the authority to establish the terms and conditions upon which aliens can be naturalized.[39] Consequently, no alien has the right to naturalization unless all the statutory requirements have been complied with. *Maney v. U. S.*, 278 U.S. 17, 22, 49 S.Ct. 15, 73 L.Ed. 156 (1928); *U. S. v. Ginsberg*, 243 U.S. 472, 475, 37 S.Ct. 422, 425, 61 L.Ed. 853 (1917). Naturalization is "illegally procured" if some statutory requirement which is a condition precedent to naturalization is absent at the time the petition for naturalization is granted. H.R. Rep.No.1086, 87th Cong., 1st Sess. 39, *reprinted in* U.S.Code & Ad.News 2950, 2983 (1961).

When defendant filed his petition for naturalization in 1958, § 318 of the Immigration and Nationality Act, 8 U.S.C. § 1429, provided that no person could be naturalized unless he had been lawfully admitted to the United States for permanent residence.[40] A valid immigration visa was necessary to obtain lawful residence in this country.[41]

39. Congress is empowered to "establish an uniform Rule of Naturalization" under Article I, Section 8, Clause 4.

40. *See also* § 316(a), 8 U.S.C. § 1427(a): "No person, except as otherwise provided in this title, shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, *after being lawfully admitted for permanent residence,* . . . ." (emphasis added)

41. At the time of defendant's immigration,

The Court views the recent Supreme Court decision, *Fedorenko v. U. S.*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), as dispositive of the issue of whether defendant illegally procured his citizenship. In that case, Fedorenko, an admitted guard for the German SS at both Trawniki and Treblinka, concealed this information from immigration officials and obtained a visa. The Supreme Court concluded that Fedorenko's failure to disclose the true facts about his service as an armed guard at Treblinka would have made him ineligible as a matter of law for a visa under the Displaced Persons Act. The Court's interpretation of several provisions of the DPA is relevant to the instant action.

Section 10 of the DPA, 62 Stat. 1013, provided: "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." The Supreme Court interpreted this provision to apply to willful misrepresentations of "material" facts and indicated that "at the very least, a misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa." *Id.* 101 S.Ct. at 749. Fedorenko's failure to reveal his past service as an armed guard at Treblinka was found by the Court to be material since, under § 2(b) of the DPA and the IRO Constitution, service as a concentration camp guard, whether voluntary or involuntary, would have prevented anyone from obtaining a visa. The DPA made all those who "assisted the enemy in persecuting civil populations" ineligible for visas. *Id.* at 748–751. Since Fedorenko had failed to satisfy a statutory prerequisite to the acquisition of citizenship—lawful admission for permanent residence in this country—his citizenship was revoked as "illegally procured." *Id.* at 752.

■ This Court previously concluded, *supra*, that the Government has shown by clear and convincing evidence that defendant served the German SS as a guard at both Trawniki and Treblinka in 1942–1943 and willfully misrepresented this service on his visa application. Harold Henrikson, the vice-consul responsible for processing defendant's visa application, testified that if an applicant had told him either (1) that he had served in a training camp such as Trawniki run by the German SS for the purpose of training guards for duties at extermination camps or (2) that he had served as a guard at an extermination camp, Henrikson would have denied such individual a visa under the DPA.[42]

In light of this testimony and the Supreme Court's opinion in *Fedorenko*, this Court must conclude that defendant's failure to disclose his service under the German SS at Trawniki and his later service as an

---

§ 13(a) of the Immigration Act of 1924, ch. 190, 43 Stat. 153, 161 (repealed in 1952) provided that "[n]o immigrant shall be admitted to the United States unless he (1) has an unexpired immigration visa...." Courts interpreting § 13(a) held that a visa obtained through a material misrepresentation was not valid. *Ablett v. Brownell*, 240 F.2d 625, 629 (D.C.Cir. 1957); *U. S. v. Shaughnessy*, 186 F.2d 580, 582 (2d Cir. 1951).

42. "Q. If an applicant stated during an interview that he was formerly a Soviet soldier, captured by the Germans, taken to a prisoner of war camp and thereafter recruited and trained at a training camp run by the Nazi SS for the purpose of training guards for duties at extermination camps and for use in other operations against the Jewish population, what effect, if any would this have on his eligibility to obtain a visa?

"A. I would deny the visa.
"Q. Upon what do you base this opinion?
"A. Well, my general recollection of the Displaced Persons Program and of the Displaced Persons Act is that it was not intended to benefit those who had aided, abetted and helped the Germans in their subjugation of Europe and their persecution of civilian population, and I would think that anybody who was connected with the SS in any way would be, in my opinion, ineligible for a visa.
"Q. Given the same facts except this time the individual stated to you he worked under the SS in an extermination camp.
"A. That would be a stronger case.
"Q. What would have happened?
"A. He would have been denied a visa." (Tr. 854–855)

armed guard at Treblinka were material misrepresentations under §§ 2(b) and 10 of the DPA. Since defendant was ineligible for a visa under the DPA, his citizenship must be revoked as "illegally procured" because he failed to satisfy a statutory prerequisite of naturalization.[43]

The Court rejects defendant's argument that he gave false statements on his visa application because he was afraid of repatriation to the Soviet Union.[44] The Fifth Circuit in *Fedorenko*, 597 F.2d 946, 953 (1979), rejected a similar defense and the Supreme Court, although not directly addressing the issue, opined that the fact that Fedorenko gave false statements because he was motivated by fear of repatriation "indicates that he understood that disclosing the truth would have affected his chances of being admitted to the United States and confirms that his misrepresentation was willful." 101 S.Ct. 748 at n.26. The Supreme Court reaffirmed prior cases which rejected lower court efforts to moderate the statutory mandate of Congress in denaturalization proceedings. "[O]nce a district court determines that the Government has met its burden of proving that a naturalized citizen obtained his citizenship illegally or by willful misrepresentation, it has no discretion to excuse the conduct." 101 S.Ct. 753.[45]

## B. Naturalization Obtained by Concealment Of A Material Fact Or By Willful Misrepresentation

The Court alternatively finds that defendant's certificate of naturalization

**43.** The Court's conclusion that defendant illegally procured his naturalization may be reached in a less elliptical manner. Section 13 of the DPA was amended in 1950, 64 Stat. 227, to provide: "No visa shall be issued under the provisions of this Act as amended . . . *to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin*, or to any person who has voluntarily borne arms against the United States during World War II." (emphasis added) Leo Curry, the case analyst who granted defendant status under the DPA, testified that if defendant had disclosed either his service at Trawniki or Treblinka, he would have been found ineligible by the DPA and refused admission to the United States under § 13. (Tr. 796–797)

**44.** After the war, there was a sharp divergence of viewpoint between the U.S. Government and the U.S.S.R. as to the repatriation policy to be followed concerning displaced persons born in areas subject to the governmental authority of the U.S.S.R. The U.S.S.R. demanded that the other Allied powers forcibly repatriate these persons while the U.S. opposed any such efforts. H.R.Rep.No.1854, 80th Cong., 2d Sess. 7 (1948). Testimony at trial indicated that forcible repatriation did occur early after the war, from May 22-September 30, 1945 when over two million persons were repatriated to the U.S.S.R. (Tr. 1045–1047) A former eligibility officer for the IRO testified that incidents of forcible repatriation also occurred until 1948. (Tr. 976) It is undeniable, therefore, that certain fears concerning possible forcible repatriation did permeate the refugee camps. However, Dr. Edward O'Connor, formerly a commissioner on the Displaced Persons Commission, indicated that it was the policy of the U.S.

Government to oppose forcible repatriation and that such repatriation was stopped by a Presidential proclamation in the fall of 1945. (Tr. 1047, 1057). The IRO Constitution also allowed for individual freedom of choice with respect to repatriation, and a refugee could avoid being repatriated by stating a valid objection to returning to his country of origin. Annex I, Part I, Section C of IRO Constitution, 62 Stat. 3050 (1946). Finally, defendant himself admitted that after 1947 his fear of being forcibly repatriated to the Soviet Union had subsided. (Tr. 1081) Defendant did not fill out his IRO application until 1948 and his visa application until 1951.

**45.** The Court also finds that defendant illegally procured his citizenship because he lacked the good moral character required under Section 316(a) of the Immigration and Nationality Act, 8 U.S.C. § 1427(a). In determining good moral character, "the court shall not be limited to the petitioner's conduct during the five years preceding the filing of the petition, but may take into consideration as a basis for such determination the petitioner's conduct and acts at any time prior to the period." 8 U.S.C. § 1427(e). Specifically, the Court concludes that defendant's misrepresentations on his visa application concerning his service with the German SS at Trawniki and Treblinka precluded him from establishing good moral character under Section 101(F), 8 U.S.C. § 1101(f): "No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is or was—. . . (6) one who has given false testimony for the purpose of obtaining any benefits under this Act; . . . ."

must be canceled under section 340(a), 8 U.S.C. § 1451(a) as it was procured by "concealment of a material fact or by willful misrepresentation." Denaturalization may be invoked for concealment of material facts or willful misrepresentation of material facts. *Costello v. U. S.*, 365 U.S. 265, 272 at n.3, 81 S.Ct. 534, 538, 5 L.Ed.2d 551 (1961). The definition of "materiality" under § 1451(a) was posited by the Supreme Court in *Chaunt v. U. S.*, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960). In *Chaunt*, the Court stated that to prove misrepresentation or concealment of a material fact the Government must prove by clear and convincing evidence *either* (1) that facts were suppressed which, if known, would have warranted denial of citizenship *or* (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship. *Id.* at 355, 81 S.Ct. at 150.[46]

None of the questions in defendant's 1958 application for citizenship (Govt. Ex. 25A) explicitly required defendant to divulge his service at Trawniki and Treblinka in 1942–1943. However, question 23 inquired whether defendant had "given false testimony for the purpose of obtaining any benefits under the immigration and nationality laws." In reply, defendant falsely answered "no." Had defendant answered in the affirmative, further elaboration was required.[46A]

By denying he had ever given false testimony in obtaining his visa, defendant suppressed facts concerning his whereabouts during the war, which, if known, would have warranted denial of his petition for naturalization. A former naturalization examiner testified that when an application for naturalization is filed, the first step is to determine whether the applicant was lawfully admitted for permanent residence. (Pritchard, Tr. 870) As previously indicated, defendant's service for the German SS at Trawniki and Treblinka disqualified him for lawful permanent residence under the Displaced Persons Act. Defendant's false answer to question 23 therefore suppressed the existence of these disqualifying facts which, if disclosed, would have resulted in a denial of his petition for naturalization.[47] Consequently, defendant's naturalization must also be revoked because it was procured by a willful misrepresentation of material facts.[48]

---

**46.** The Supreme Court recently declined to address a problem which has arisen concerning the interpretation and viability of the second *Chaunt* standard of materiality. *Fedorenko v. U. S.*, 449 U.S. 490, 101 S.Ct. 737, 753 at n.40, 66 L.Ed.2d 686 (1981). At issue is whether the Government must always demonstrate the existence of disqualifying facts—facts that themselves would warrant denial of citizenship—in denaturalization actions under § 1451, or whether the Government need only prove that disclosure of the true facts would have led to an investigation that might have uncovered other facts warranting denial of citizenship. *Compare U. S. v. Rossi*, 299 F.2d 650, 652–53 (9th Cir. 1962) *with U. S. v. Fedorenko*, 597 F.2d 946, 950 (5th Cir. 1979); *Kassab v. I.N.S.*, 364 F.2d 806, 807 (6th Cir. 1966); *U. S. v. Oddo*, 314 F.2d 115, 118 (2d Cir.), *cert. den.*, 375 U.S. 833, 84 S.Ct. 50, 11 L.Ed.2d 63 (1963); *Langhammer v. Hamilton*, 295 F.2d 642, 648 (1st Cir. 1961).

**46A.** When the applicant lies in response to a direct question, his deception is covered by the "willful misrepresentation" language of the statute. 3 Gordon and Rosenfield, Immigration Law and Procedure § 20.4b, at 20–14 (1980).

**47.** Defendant's false answer to question 23 would also have made him ineligible for citizenship since his service with the German SS at Trawniki and Treblinka and the concealment of this service on his visa application, if disclosed at the time defendant filed his application for naturalization, would have revealed that defendant lacked the good moral character required by 8 U.S.C. §§ 1101(f) and 1427(a).

**48.** The Court finds it unnecessary to decide whether defendant's admitted service in German organized Russian and Ukrainian military units would, considered alone, also justify denaturalization. The defendant testified that he was involuntarily conscripted into these units and never engaged in combat while a member of the units. Section 2(b) of the DPA, defining "displaced person" in reference to the IRO Constitution, specifically excluded individuals who had "voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations." Annex I, Part II, IRO Constitution, 62 Stat. 3051–3052. In 1950, § 13 of the DPA was amended to include a provision disqualifying from immigration "any person who has voluntarily borne arms against the United States

## MOTION FOR NEW TRIAL

■ Following the trial of this matter but before the Court rendered its decision, defendant requested that a new trial be granted. Defendant's motion for a new trial, styled as a motion for a mistrial, essentially argues that the Government failed to comply with certain pretrial discovery requests and consequently defendant was deprived of information necessary for his defense. On May 4, 1981, the Court held a hearing on defendant's motion. Defendant's allegations have been carefully reviewed. The Court concludes that defendant's motion for a new trial should be denied.

Defendant's request for a new trial is based on a letter received from Government counsel at the conclusion of the trial.[49] The letter indicated that shortly before trial, the Government received statements of five witnesses from the U.S.S.R. The witnesses were interviewed by Soviet authorities at the request of the Government although Government counsel did not speak directly to the witnesses or have any personal contact with them. All five witnesses were present at the Trawniki training camp at various times in 1942.[50] One of the witnesses, Nikolai Dorofeev, stated that he remembered the defendant from Trawniki and identified two photographs of the defendant. The remaining witnesses had no recollection of the defendant. The letter explained that the statements had been received just prior to trial and that it had been impossible to obtain either the live or deposition testimony of the Soviet witnesses. Government counsel noted he was not requesting that the statements be made part of the trial record, but rather he was informing defendant's counsel of the existence of the statements "so that the record of discovery in this case is complete."

Defendant complains that the information offered by the Government in this letter was previously requested in various interrogatories and that the Government had a duty to provide the names of these Soviet witnesses seasonably, before trial, by supplementing its prior answers to interrogatories under Fed.R.Civ.P. 26(e)(1)(A).[51] Specifically, question one of defendant's first set of interrogatories, January 24, 1978, required the Government to state the name and address of every person known to the Government who had any knowledge of the alleged actions of the defendant.

Ordinarily, the duty to supplement responses under Rule 26(e) concerning the identity and location of persons having knowledge of discoverable matters arises "because of the obvious importance to each side of knowing all witnesses and because information about witnesses routinely comes to each lawyer's attention." Adviso-

during World War II." 64 Stat. 227. Legislative history shows that this amendment was meant to apply only to aliens who voluntarily bore arms against the United States on the western front. Conf.Rep.No.2187, 81st Cong., 2d Sess. 16, *reprinted in* U.S.Code Cong. Service 2513, 2524 (1950). *See also*, 96 Cong.Rec. 8221 (1950). Under either provision, the major touchstone was the "voluntary" nature of the service performed. The simple assertion by an applicant, either seeking IRO eligibility or displaced person status, that he served involuntarily in a German unit raised serious questions because the applicant bore the burden of proof concerning the "voluntariness" of his service. *See* IRO Manual, *supra*, at 6; § 10 of the Displaced Persons Act, as amended, 62 Stat. 1013. Expert testimony of immigration officials uniformly indicated that an applicant's unsubstantiated contention of involuntary service was disbelieved. (Tr. 709–710; 797–801; 859–860)

**49.** A copy of the letter was also forwarded to the Court.

**50.** Two of the witnesses later served at the Treblinka labor camp. This camp was a separate installation located several kilometers away from the extermination camp where defendant allegedly was present. *See* statements of S. E. Kharkovsky and A. N. Kolgushkin.

**51.** Fed.R.Civ.P. 26(e)(1)(A) provides in pertinent part:

"A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, . . . ."

ry Committee's Note, 48 F.R.D. 508 (1969). The Court is not insensitive to the additional consideration in the instant case that the defendant was necessarily dependent on United States governmental agencies for assistance in obtaining relevant information from Soviet authorities.

The Court finds that the Government had a duty under Fed.R.Civ.P. 26(e)(1)(A) to disclose the identity of one witness, Nikolai Dorofeev, by supplementing its response to the defendant's 1978 interrogatory request. Dorofeev's statement reflects, at the least, a tentative recollection of the defendant from the Trawniki training camp. This case involves events which allegedly occurred in 1942–1943 with potential eyewitnesses scattered throughout the world. In cases of such an exceptional nature it is especially important that the Government strictly comply with specific discovery requests concerning the identity and location of witnesses with knowledge of facts related to the Government's allegations.[52] Careful scrutiny of the statements of the other Soviet witnesses reveals that only Dorofeev has any potential knowledge of the alleged actions of the defendant. The four remaining witnesses expressly denied knowing the defendant while at Trawniki and failed to identify photographs of the defendant. The Government did not, therefore, breach any duty under Rule 26(e)(1)(A) with respect to these four witnesses.

Defendant argues that he has been prejudiced by the Government's failure to seasonably supplement his discovery requests and is entitled to a new trial. Undoubtedly, the Court has discretion to ameliorate any prejudice caused by the Government's failure to supplement the defendant's discovery requests. 8 Wright & Miller, Federal Practice and Procedure § 2050 (1970). In this regard, it is appropriate to evaluate the quality of the potential evidence Dorofeev or the other Soviet witnesses might contribute in order to determine whether defendant's trial has been prejudiced to the extent alleged.[53] Certainly, evidence which is cumulative in nature or which merely affects, in some insignificant respect, the credibility of evidence already considered should not justify a new trial at this stage of the proceedings.[54]

The Court does not believe that the potential testimony of Dorofeev or of any of the other Soviet witnesses is of such a nature as to alter the outcome in the case. Defendant contends that the testimony of these Soviet witnesses might in some way discredit the authenticity of the Trawniki card, Government's Exhibits 5 and 6. The Court must reiterate that at no time during the trial was any evidence introduced which brought into question the authenticity of the Trawniki card. In fact, an examination of the statements taken from the Soviet witnesses tends to corroborate the existence of such identification cards and therefore the authenticity of Government's Exhibits 5 and 6. Three of the Soviet witnesses stated that upon entering the Trawniki camp a form was filled out which contained a photograph and biographical data of each soldier.[55] It is important to emphasize that

---

52. In finding that the Government breached its duty under Fed.R.Civ.P. 26 to supplement its prior discovery responses, the Court does not ascribe any sinister motivation to Government counsels' conduct. The Government asserted its belief that any duty it had to supplement its answers to the 1978 interrogatory was modified by defendant's subsequent interrogatories specifically seeking the identities of any Soviet witnesses whom the Government intended to depose or call as witnesses at trial. See question 4, defendant's fourth set of interrogatories, April 14, 1980.

53. Even though the Court has found that the Government need only have provided defendant with the identify of Dorofeev, in light of the

exceptional circumstances in this case, the Court has also examined the statements of the remaining Soviet witnesses for any evidence which might mandate a new trial.

54. Cf. motion for a new trial under Fed.R.Civ.P. 59 on the basis of newly discovered evidence. Thomas v. Nuss, 353 F.2d 257, 259 (6th Cir. 1965); 6A Moore's Federal Practice ¶ 59.08[3], at 59–118 (2d ed. 1979).

55. See statements of S.E. Kharkovsky, A.N. Kolgushkin and V.V. Orlovsky. Defendant's suggestion that the identification forms also contained the soldier's fingerprints is not supported by the Soviet witnesses' statements.

the Government did not base its allegation that defendant served at Trawniki on eyewitness testimony. The Government's proof of defendant's service at Trawniki is documentary, Government's Exhibits 5 and 6, and the authenticity of these documents, although merely questioned by the defendant, has not been impugned by even a scintilla of evidence. On the other hand, the Government established by sufficient evidence that these documents are authentic.

Review of the remaining information contained in the five witness statements reveals evidence which simply corroborates the testimony offered by the Government at trial concerning the capture of Soviet soldiers on the eastern front, their placement in German POW camps such as Chelm and Rovno, the transfer of Soviet soldiers from these POW camps to the SS training camp of Trawniki, the nature of the Trawniki camp, and the use of Trawniki personnel by the Germans in various operations persecuting the Jewish population.

The Court concludes, therefore, that the defendant is not entitled to a new trial because of the Government's tardy revelation of Dorofeev and the other Soviet witnesses. An examination of the witnesses' statements reveals evidence which is cumulative and not of such character that would probably produce a different result on a new trial.[56]

Alternatively, the defendant requests a new trial for the following reason. After trial was completed, defense counsel obtained a copy of an affidavit of Chaim Sztajer, a survivor of the extermination camp at Treblinka. Sztajer, a resident of Australia, saw a photograph in a local newspaper of another individual who is presently confronted with denaturalization proceedings in the United States similar to the instant case.[57] On September 2, 1980, Sztajer submitted an affidavit for use in this other proceeding in which he stated that the photograph of the person he saw in the Australian papers was that of the man known to him at Treblinka as "Ivan."

Defendant charges the Government with failing to provide him with information of this apparent misidentification despite discovery requests for such information. Defendant's allegation, ominous at first glance, must be considered specious on closer examination. Defendant's fourth set of interrogatories, April 14, 1980, question 11, sought the names and addresses of each person who had viewed photospreads including a photograph of the defendant and who had failed to identify the defendant. In May 1980, the Government answered this interrogatory and provided defendant with the names and addresses of twelve survivors of Treblinka, including that of Chaim Sztajer. Defendant apparently never contacted Sztajer or sought additional discovery concerning information Sztajer might possess.

Consequently, the Court does not believe that the effects of defendant's lack of diligence in pursuing information offered at an earlier date should be visited upon the Government at this time. Defendant's motion for a new trial on this alternative ground is therefore denied.

## CONCLUSION

For the reasons set forth above, the Court finds that the November 14, 1958 order of the United States Court for the Northern District of Ohio, admitting the defendant, John Demjanjuk, to citizenship of the United States of America, is hereby revoked and vacated and his Certificate of Naturalization, Number 7997497, is canceled on the grounds that such order and Certificate were illegally procured and were procured by willful misrepresentation of material facts under 8 U.S.C. § 1451(a). Accordingly, judgment will be entered in

---

**56.** In light of all the surrounding circumstances and for the reasons set forth above, the Court does not find it necessary to reopen the case to take the testimony of any of the five Soviet witnesses. 6A Moore's Federal Practice ¶ 59.-04[13], at 59–30 (2d ed. 1979).

**57.** Government counsel in the present litigation is also trial counsel in the other denaturalization proceedings referred to above.

favor of plaintiff United States of America and against defendant John Demjanjuk.

IT IS SO ORDERED.