**UNITED STATES of America, Plaintiff,**

v.

**Johann LEPRICH, a/k/a Johann Lepprich, Defendant.**

**No. 86–CV–72531–DT.**

United States District Court,
E.D. Michigan, S.D.

July 13, 1987.

Michael Bernstein, Joseph Lynch, U.S. Justice Dept., Office of Special Investigations, Wash., D.C., Gary M. Maveal, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

William W. Swor, Detroit, Mich., for defendant.

## OPINION

HACKETT, District Judge.

Plaintiff United States of America has filed a motion for summary judgment. The material facts are not in dispute. Based upon a careful review of the records and having heard the argument of counsel, the court finds as follows:

### Facts

1. Johann Leprich was born on July 7, 1925, in Petelea, Romania. Petelea has also been known by the name of Birk in German and Petele in Hungarian.

2. Leprich became a member of the *Waffen* SS in November, 1943.

3. Leprich commenced service as a uniformed SS guard at the Mauthausen concentration camp in November or December, 1943.

4. At Mauthausen, Leprich was a member of the SS *Totenkopf-Sturmbann* (Death's Head Battalion), and wore the skull-and-crossbones symbol on his collar.

(The International Military Tribunal at Nuremberg in 1946 found that the SS, including the Death's Head Battalion, was a criminal organization involved in "the persecution and extermination of Jews, brutalities and killings in concentration camps, excesses in the administration of occupied territories, administration of the slave labor program and the mistreatment and murder of prisoners of war." (See: Nurnberg Trial, 6 F.R.D. page 69, 143.)

5. Leprich continued to serve at the Mauthausen concentration camp until April or May, 1944.

6. Mauthausen was intended as a camp for severe punitive action against enemies of the Reich.

7. Inmates were starved, beaten, tortured, and killed by a variety of methods, including gassing, hanging, strangling, heart injection, electrocution, beating, drowning, torturing, burning, starving, and shooting.

8. Inmates were forced to work at the camp. Many worked at the quarry where they died of overwork, were beaten to death, or were shot by the guards.

9. Prisoners were forced to cross through the chain of guards so that they would be shot by guards.

10. Incarcerated at Mauthausen were groups including Jews, Gypsies, Jehovah's

Witnesses, and Poles, as well as members of almost every nationality in Europe.

11. Jews were identified as Jews in the camp and were treated especially harshly because they were Jews.

12. Leprich's duty at Mauthausen was to guard the camp inside which the prisoners lived.

13. While performing guard duty at Mauthausen, Leprich carried a rifle on his shoulder and ammunition.

14. At Mauthausen, Leprich was assigned to numerous guard posts around the camp. He stood guard on the ground and in watchtowers.

15. Leprich received pay for his service as a guard at Mauthausen.

16. Leprich was given days off during his service as a guard at Mauthausen.

17. Leprich remained a member of the *Waffen* SS until his capture by the United States Army in June, 1945.

18. Leprich has never been in Sopron, Hungary.

19. At no time in 1944 or 1945 was Leprich a member of the Hungarian army.

20. Leprich was held as a prisoner-of-war by the United States army until June, 1946.

21. Leprich was issued a visa to immigrate to the United States on February 12, 1952, pursuant to the Displaced Persons Act of 1948, as amended.

22. In his signed and sworn visa application, Leprich listed his residences through 1946 as follows: "1939–1943 Birk, Rumania; May, 1945, soldier in Hungarian army; 1946, Sopron, Hungary."

23. The report of Displaced Persons Commission ("DPC") analyst Edward Kelly refers to Leprich's DPC Fragebogen (application), which gave his history as "Service in the Hungarian Army" from 1943 to 1945 and "Farm help in Hungary and Huettenheim, Germany" from 1945 to 1949.

24. It is untrue that Leprich was a soldier in the Hungarian army from 1943 through May 1945 and that he resided in Sopron, Hungary from May, 1945 through 1946.

25. Upon arriving in the United States, Leprich signed and swore in an affidavit that he had "never advocated or assisted in the persecution of any person because of race, religion, or national origin."

26. In seeking to immigrate to the United States, Leprich never informed any United States official that he had been a member of the *Waffen* SS or a guard at Mauthausen.

27. If it had been known that Leprich had been a member of the *Waffen* SS, immigration officials would have commenced an investigation into the nature of that service.

28. If it had been known that Leprich had been a guard at Mauthausen, he would not have been granted a visa.

29. Leprich entered this country on March 29, 1952.

30. Leprich became a United States citizen on December 30, 1958.

### Evidence and Law

A certificate of naturalization must be revoked if it was illegally procured. 8 U.S.C. § 1451(a); *Fedorenko v. United States*, 449 U.S. 490, 516–18, 101 S.Ct. 737, 752–53, 66 L.Ed.2d 686 (1981). Naturalization is illegally procured "if some statutory requirement which is a condition precedent to naturalization is absent at the time the petition for naturalization is granted." *United States v. Demjanjuk*, 518 F.Supp. 1362, 1380 (N.D.Ohio 1981), *aff'd*, 680 F.2d 32 (6th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982); *see* H.R.Rep. 1086, 87th Cong., 3rd Sess. 39, *reprinted in* 1961 U.S.Code Cong. & Ad. News, 2950, 2983. Lawful admission into this country, with a valid immigrant visa, is a statutory requirement for naturalization. *See* 8 U.S.C. § 1427(a)(1).

The evidence establishes that defendant was not eligible for the visa he received under the Displaced Persons Act ("DPA") of 1948, Pub. L. No. 774, 62 Stat. 1009, as amended June 16, 1950, Pub. L. No. 555, 64 Stat. 219. He was ineligible because he was a guard at the Mauthausen concentra-

tion camp and because he misrepresented his wartime service by failing to disclose his guard duty in his visa application. Because he was not eligible for the visa he received, he did not have a valid visa and he was not lawfully admitted to this country. He therefore failed to satisfy all the jurisdictional requirements for naturalization. As a consequence, his naturalization was illegally procured and must be revoked. *See Fedorenko*, 449 U.S. at 515–16, 101 S.Ct. at 751–52.

Defendant's service as an armed guard at a concentration camp rendered his visa illegally procured, even if defendant could prove his service to have been involuntary. The court in *Fedorenko* explicitly found that voluntariness was not a factor in determining whether a guard "assisted in persecution," 449 U.S. at 512–13, 101 S.Ct. at 750. The court's reasoning relied on the inclusion of a voluntariness requirement in the language of certain exclusionary provisions, but its exclusion from the persecution provisions. In Section 13 of the amended DPA, Congress included a voluntariness requirement in a provision regarding the bearing of arms against the United States, but excluded the requirement from the persecution provision. This court therefore must refuse, as did the court in *Fedorenko*, to " 'imply a condition which is opposed to the explicit terms of the statute.' " *Id.* at 513, 101 S.Ct. at 750, *quoting Detroit Trust Co. v. Barlum S.S. Co.*, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934).

Defendant's visa would have been illegally procured under Section 13 even if he had secured it without making misrepresentations. In *Fedorenko* the Court found that: (1) concentration camp guards were ineligible for visas under the DPA, 449 U.S. at 513, 101 S.Ct. at 750; and (2) failure to disclose such service was a misrepresentation making an applicant ineligible for a visa under the DPA, 449 U.S. at 513–14, 101 S.Ct. at 750–51. The first finding alone, without proof of misrepresentation, is sufficient to establish that an alien's visa was illegally procured. *United States v. Kairys*, 600 F.Supp. 1254, 1269–70 (N.D.Ill. 1984), *aff'd* 782 F.2d 1374 (7th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986), and *Demjanjuk*, 518 F.Supp. at 1382, n. 43.

These cases apply the more general principle that illegal procurement can be established without proof of a misrepresentation. This principle also has been applied in DPA cases which have found grounds for denaturalization separate and distinct from grounds based on misrepresentation. *See United States v. Koziy*, 540 F.Supp. 25 (S.D.Fla.1982), *aff'd*, 728 F.2d 1314 (11th Cir.), *cert. denied*, 469 U.S. 835, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984).

In summary, because Leprich was a concentration camp guard, he was ineligible for the visa he received and his citizenship was illegally procured. There is no genuine issue concerning the dispositive fact of Leprich's guard service.

Further, Section 10 of the DPA made inadmissable into the United States "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person." 62 Stat. 1013. The regulations of the DPC further defined this exclusionary provision to encompass "a willful misrepresentation, oral or written, to any person while he is charged with the enforcement or administration of any part of the Displaced Persons Act, as originally enacted or as amended, of any matter material to an alien's eligibility for any of the benefits of the said act, as originally enacted, or as amended." 8 C.F.R. § 700.11 (1951 Supp.). Under *Fedorenko*, an applicant became ineligible under the DPA because of a misrepresentation only if the misrepresentation was material. 449 U.S. at 507 n. 28, 101 S.Ct. at 748 n. 28.

The essence of defendant's misrepresentations is contained in the following response on his sworn application for immigration visa:

"That since reaching the age of 14 years I have resided at the following places, during the periods stated, to wit:

1939–1943 Birk, Rum.; May 1945 soldier in Hungarian Army; –1946 Sopron, Hungary; December 1950 Huettenheim, Ger-

many; January 1952 Ennheim, Germany; up to date Karlsfeld, Munich, Germany." According to defendant's own deposition testimony, this response accurately reflects his places of residence, with two critical exceptions. First, he was never a soldier in the Hungarian army after late 1943. Rather, from that time through June, 1945, he was a member of the German *Waffen* SS, stationed for at least part of the time as a guard at the Mauthausen concentration camp. Second, he has never been in the town of Sopron, Hungary; from June 1945 through June 1946, he in fact was held in United States prisoner-of-war camps.

To fully appreciate the nature of these misrepresentations, it is necessary to trace defendant's steps through the DP screening process designed to identify and exclude ineligible applicants. At the outset of this process, the applicant submitted a Fragebogen (questionnaire). He was then the subject of an investigation, including a personal interview of the applicant by the U.S. Counterintelligence Corps ("CIC"). With the Fragebogen and CIC report in hand, a DPC analyst prepared a report regarding the applicant's character, history and eligibility under the Act, as required by Section 10 of the Act and Executive Order No. 10131, June 16, 1950, 15 F.R. 3859.

The report of the DP analyst reviewing defendant's application shows the history of that application. The DP report recounts defendant's history "as set forth in his U.S. DPC Fragebogen." That Fragebogen placed him in "Service in the Hungarian Army" from 1943 to 1945 and "Farm help in Hungary and Huettenheim, Germany" from 1945 to 1949. The DP report refers also to the CIC report dated August 22, 1951, which contained information relating to defendant's service in the Hungarian army. Thus, the DP report indicates a consistent pattern of misrepresentation by defendant, in a Fragebogen which hid his *Waffen* SS and Mauthausen service behind a falsely elongated Hungarian army membership, and in a CIC interview which informed a CIC report focusing on the Hungarian army rather than the *Waffen* SS and Mauthausen.

Having been found eligible for admission into the United States under the DPA by the DPC, defendant then came before State Department vice-consul William Kasson. Mr. Kasson's affidavit describes in detail the procedures he employed in reviewing a visa application. He conducted two interviews with each applicant, one prior to the typing of answers on the visa application and the other after the typing. In the first interview, he asked the applicant for the answer to each question on the visa application. In the second interview, he reviewed each typed question and answer with the applicant to make sure the application was correct. At the end of the second interview, the applicant swore to the correctness of the information on the application and signed the application in the presence of Mr. Kasson.

At his deposition, defendant admitted the falsehood of the critical answer on his visa application, but denied that he gave false information willfully. Although he remembered almost none of the questions the consular officer asked, he stated that the consular officer never asked what he had done during World War II. Further, he denied reviewing the visa application with care, and suggested that the false information might have been supplied by his father.

For several reasons, defendant's self-serving and incredible story cannot be given any weight by a reasonable factfinder. First, the visa application on its face contains clearly false information. The response "soldier in Hungarian army" shows that the respondent understood the question to be directed at service in wartime organizations, such as guard duty in the *Waffen* SS. The completed application was sworn to and signed by defendant before vice-consul Kasson.

Second, in light of the procedures employed by vice-consul Kasson, clearly false information such as that appearing on defendant's visa application could only have appeared by virtue of the applicant's willful misrepresentation. Kasson's affidavit is buttressed by State Department regulations in effect at the time of defendant's

application. Excluded classes of aliens were to be fully described to the individual applicant. 22 C.F.R. § 42.325 (1949). At all times, competent interpreters were to be used to avoid misunderstandings. 22 C.F.R. § 42.324 (1949). Any person 14 years of age or over was to execute, sign and verify his own application. 22 C.F.R. § 42.318 (1949).

The presumption of regularity applicable to public officials creates a presumption that these mandated procedures were, in fact, followed. "The presumption of regularity supports the official acts of public officers and, in the absence of *clear evidence* to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926) (emphasis added). The proof required to overcome the presumption has been described as "well-nigh irrefragable," *see, e.g., Loftin v. U.S.*, 6 Cl.Ct. 596 (1984), *aff'd* 765 F.2d 1117 (Fed. Cir.1985). This presumption strongly supports the conclusion that proper consular procedures were followed and that defendant willfully made any material misrepresentations appearing on his visa application. *Daskaloff v. Zurbrick*, 103 F.2d 579 (6th Cir.1939); (Visa applicant's plea of misunderstanding questions given little weight in light of presumption); *U.S. v. Dercacz*, 530 F.Supp. 1348, 1352 (E.D.N.Y.1982).

The DPC report shows a consistent pattern on defendant's part, displayed both on his Fragebogen and in his CIC interview, of misrepresenting his true wartime activities by stretching his Hungarian army service into years 1944 and 1945. His Fragebogen further misrepresented his postwar imprisonment by the United States army, changing it into a time period spent as a farmer in Hungary. Defendant's desire to hide his activities in the *Waffen* SS was evidenced further in his use of "home remedies" to remove his SS bloodtype tattoo. He did this after his imprisonment by the United States army, but before coming to the United States, because he did not want people to think badly of him. Upon arriving in the United States, he falsely swore to an affidavit, mandated by Section 13 of the DPA,

disclaiming any assistance in persecution. This misrepresentation on his visa application was one of defendant's several willful attempts to reconstruct his past.

Johann Leprich's speculation that the false information might have come from his father is baseless. The immigration file of defendant's father indicates that his own visa application was signed on a different day, in front of a different vice-consul, than defendant's visa application. The applications of defendant's mother and younger brother were associated with that of defendant's father, but defendant's application was entirely separate. Defendant was 26 years old when he signed his visa application and he was responsible for its contents. His efforts to place the blame for the critical misrepresentations contained therein must fail.

The recent court decision in *United States v. Leili*, No. 86–1370, bench op. (D.N.J. Dec. 29, 1986) supports the following conclusion of this court in this case.

### Conclusion

Defendant was not eligible for the visa he received because (1) he assisted in the persecution of persons due to their race, religion or national origin; and (2) he willfully made material misrepresentations in order to enter this country. Because he was not eligible for his visa, he was never lawfully admitted to this country and his citizenship was illegally procured. For the foregoing reasons, the government's motion for summary judgment and request that defendant's illegally procured naturalization be revoked are granted.