**UNITED STATES of America, Plaintiff,**

v.

**George LINDERT, Defendant.**

No. 4:92CV1365.

.United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 18, 1995.

---

Michael Anne Johnson, Office Of The U.S. Attorney, Cleveland, OH, Betty Ellen Shave, Edward A. Stutman, Kenneth I. Misrok, Department of Justice, Office Of Special Investigations, Washington, DC, for plaintiff.

George C. Economus, Economus & Economus, Youngstown, OH, Joseph T. McGinness, Cleveland, OH, for defendant.

### ORDER

ANN ALDRICH, District Judge.

The Court has filed its memorandum and order finding that the government did not prove with sufficiently convincing evidence that Lindert's moral character was inadequate for citizenship because of his military service or his answers to questions on immigration and naturalization forms, nor that his responses on his naturalization petition constituted willful misrepresentation or concealment of a material fact. Therefore,

IT IS ORDERED that the order of the Mahoning County Common Pleas Court of December 11, 1962, (Petition No. 26492, Certificate No. 7914531, nationalizing George Lindert) is sustained.

IT IS FURTHER ORDERED that this judgment is final and appealable.

### MEMORANDUM AND ORDER

The United States of America brings this action to revoke the citizenship of George Lindert pursuant to 8 U.S.C. § 1451(a). The government alleges that Lindert participated in the Nazi program of persecution and therefore lacked the "good moral character" legally required for naturalization. The government further alleges that certain of Lindert's statements in the immigration and naturalization process constituted false testimony in contravention of 8 U.S.C. § 1101(f)(6). Finally, the government alleges that Lindert illegally obtained his naturalization through willful misrepresentation and concealment of material fact.

A bench trial consumed more than three weeks, during which over 300 exhibits comprising thousands of pages (some translated more than twice), were received. These documents covered a period of over 50 years, and were, as admitted by both sides, of varying degrees of reliability. After extensive briefing, and consideration, this Court now issues its findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52. For the reasons set forth below, this Court finds that, despite thorough, diligent, and exhaustive effort, the United States has not met its very heavy and exacting burden of proof in challenging Lindert's naturalization. Accordingly, judgment is entered in favor of Lindert and his citizenship is undisturbed.

I.

### A. Concentration camps generally

The Nazi Party's rise to power in Germany in the 1930s saw the creation of brutal and highly efficient political structures. Terror and persecution were organized through a number of efforts, including the creation of "Schutzhaft" (protective custody) as a means of dealing with political dissidents, "undesirables," and others considered a threat by the Nazis. Concentration camps, developed by the Nazis in the 1930s, grew rapidly with the onset of war. Most prominent in the camps' populations were Jews, Communists, Marxists, religious dissenters (particularly Jehovah's Witnesses), clergy, homosexuals, and gypsies. Without any meaningful legal recourse, a prisoner's detention in a concentration camp was indefinite. Virtually no prisoners were released from the camps after 1939.

Concentration camps were places of extreme and horrible persecution, where inhumane acts were commonplace and institutionalized. At many camps, execution and torture were part of the daily routine. Additionally, certain prisoner populations were targeted for "annihilation through work." Weak or injured prisoners who were unable to provide sufficient work were generally selected for execution.

The Nazis developed an elaborate and thorough set of regulations governing the operations of concentration camps and the duties of those who served in them. These service regulations included procedures for guarding and escorting prisoners. Guards were specifically instructed that there would be no disciplinary action against any guard who shot "an escaping prisoner." This Court found no evidence to contradict this guaran-

tee. Untold thousands of prisoners died in concentration camps during the war.

In addition to detailed operating regulations, concentration camps also had an elaborate system of recordkeeping. Included in the records are indications of camp personnel's conduct with respect to prisoners. For each prisoner's death, the death books indicate a specific cause of death. There is considerable reason to doubt some of the notations in the death books where the entry indicates that a prisoner was "shot while escaping." Such entries were often used to indicate deaths in instances of brutality by camp personnel. Another common entry is that prisoners died of "natural" causes. Death in such cases were more likely the result of the generally unsanitary conditions in the camps, the lack of adequate nutrition, the nearly complete lack of health care, the prolonged exposure of the inmates to inclement weather and the constant, strenuous work. While these kinds of inaccuracies existed in the recordkeeping system, one remarkable and horrifying aspect of the books was that prisoner killings or beatings were consistently and meticulously recorded and attributed to specific camp personnel. This Court was presented with no evidence that entries attributing deaths to specific camp personnel were recorded inaccurately. There was no institutional or political reason for guards or camp personnel to cover up acts of violence against prisoners. The books are so thorough in their accounts of the deaths that it is extremely unlikely, and perhaps implausible, that a soldier who beat, shot or killed any prisoners would not appear in the massive volumes of death-books.

The regulations governing guard duties and functions were thorough in many regards. Camps were theoretically governed by common administrative procedures, developed originally at Dachau. However, camp commandants exercised significant latitude in implementing and developing operating procedures. There is evidence that each camp developed somewhat different operating procedures and job assignments. Furthermore, it is very likely that these assignments and roles changed as the war progressed.

The SS, an abbreviation for the German word "Schutzstaffel" (protection squad), was a Nazi organization formed for the benefit of Hitler. Hitler himself was the head ("Reichsführer") of the SS. During the war, the SS was charged with many aspects of policing and security within the Third Reich. Some members of the SS became part of the "Waffen SS" (armed SS). Waffen SS troops were then divided into several kinds of divisions. Among the SS divisions were combat divisions which performed functions which were virtually indistinguishable from those of the German army. Other divisions of the SS were charged with guarding concentration camps. A soldier in the SS could be assigned to either type of service, and his assignment could be changed from one to the other at any time.

*B.   Lindert's personal history*

George Lindert was born on January 3, 1922 in Passbusch, Rumania, in a region of Transylvania known as Siebenbuergen by the local ethnic Germans. Lindert and the other ethnic Germans in the area spoke Sachsisch, a dialect of high German. He grew up on his family's farm, one of about 400 homes in Passbusch at the time. He completed seven years of elementary education. During the time Lindert lived in Passbusch, there were no radios, no electricity, no newspapers, and no automobiles. There were no other towns nearby, and travel outside Passbusch was rare. The Lindert farm, like most in its community, was self-sufficient, and there was little reason or need for contact with affairs outside of Passbusch.

Lindert credibly claims that while he was in Passbusch, he knew nothing about any of the developments in German politics. It is highly unlikely he was even aware of Hungarian or Rumanian politics at the time. News in Passbusch was limited to "gossip" passed from one neighbor to the next, and the only way Lindert even knew that war had broken out was the sound of heavy gunfire in the distance.

*C.   Lindert's induction into the SS*

In 1942, when Lindert was twenty, the German SS launched a campaign to recruit

new members from among the ethnic Germans ("volksdeutsche") living outside of the German Reich. This included the Passbusch area, which had been ceded to Hungary by Romania. The Germans established specific regulations regarding recruitment and induction of new volksdeutsch SS members. These regulations included requirements of parental consent prior to the enlistment of any volksdeutsch "volunteers." However, the implementation of the recruitment effort varied from region to region in method and in success.[1] There is no direct evidence in this record that the Linderts were supportive of, or even schooled in, Nazi ideology.

Lindert credibly testified that when the Germans arrived in Passbusch in 1942, they presented his brother and him with two options: service in the German-speaking SS or service in the Hungarian-speaking Hungarian army. The recruiters provided no information regarding the type of service which would be expected of the Lindert brothers as SS soldiers. Given the language barriers involved, the "choice" was simple; over the objections of their parents, both were inducted into the SS. Service in Germany's regular army was not an option for the Linderts because they were not German citizens.

Immediately after being inducted into the SS in Bistritz, Austria, Lindert was sent to Debica, Poland, where he received combat training with other recruits. The six to eight week training included the use of small arms, rifles, machine guns, and grenades. While at the camp in Debica, Lindert and the other trainees were responsible for guarding the camp. At the conclusion of training, the SS issued assignments according to the physical capacities of the trainees. Unlike his brother, Lindert had suffered from a number of childhood diseases, was short of breath, and was not considered particularly fit. Lindert's brother was sent to the front lines in Russia and was killed in action. Lindert was assigned to service as a concentration camp guard.

### D. Lindert's service at Mauthausen and Loibl–Pass

Lindert's original assignment was to the concentration camp at Gusen, but for reasons which are not clear in the record or in the testimony, Lindert was stationed at the main camp at Mauthausen. Lindert himself credibly asserts that he does not know why his transfer orders were changed. As a private in the SS, it is virtually certain that Lindert would not have been provided such information.

The Mauthausen concentration camp consisted of a main camp and a series of subcamps. The main camp at Mauthausen included an inner, protective custody camp ("Schutzhaftlager") where prisoners were housed. Within the protective custody camp was the "appelplatz," the grounds on which roll calls were taken each morning and evening. Roll calls were compulsory, and they included a count of each body, living and dead. The appelplatz also served as the site for many of the brutalities inflicted upon the prisoners by camp personnel. The protective custody portion of the camp was set apart from the others by a stone wall. Outside the protective custody camp were a number of other buildings and barracks, including a mess hall, a crematorium and a gas chamber. The entire camp was surrounded by an outer-perimeter fence which included guard towers and electrified wires. The guard towers were designed to permit guards to see each other from tower to tower.

To the northwest of the protective custody camp was a large granite quarry (the "Wiener Graben" or "Vienna Ditch") where many prisoners were forced to work. Each morning, guards led columns of prisoners to the quarry floor. The prisoners were forced to extract large quantities of granite from the quarry without significant safety measures and without regard to the health of the prisoners. The quarry included a set of one hundred and eighty-six stone stairs from the floor to the top of the quarry. Some guards forced prisoners to march up and down the

---

1. The direct testimony presented to this Court occasionally conflicted with some of the sweeping generalizations found in the official documentation. In some instances, this Court found the direct testimony to be a more credible indication of what occurred in particular situations.

stairs carrying heavy stone as a form of punishment. In the evenings, guards marched the prisoners back to the protective custody camp, where they went through roll call again. Guards in the towers surrounding the quarry could see, at best, only portions of the quarry floor far below.

A guard at Mauthausen could have been assigned to a number of different posts. Some guards served as escorts for the prisoners on the way to and from work. Some guards served in the watchtowers along the perimeter fence. Some guards served in the towers in the inner camp. Upon occasion, guards would escort non-prisoners on passage through the camp. The records do not indicate which guards performed which duties, and without specific testimony there is no way to be certain which function any particular guard performed.

In this case, the government presented no particular evidence regarding Lindert's service in the camp. Lindert himself credibly testified that he served as a perimeter guard, with an occasional opportunity to escort non-prisoners past the quarry. There is no credible evidence to refute Lindert's assertion that he never entered the protective custody camp during his entire service at Mauthausen. Furthermore, the government offered no evidence that Lindert ever came in direct contact with any prisoners. In fact, he was directly forbidden from even speaking with them or getting close to them. Lindert's credible testimony that he never touched, threatened, or shot at a prisoner is supported by the massive volumes of records from the camp, none of which indicate any specific actions taken by Lindert.

Lindert served as a guard at the Mauthausen main camp from around June 1942 until the summer of 1943. In the summer of 1943, Lindert was transferred to the sub-camps at Loibl–Pass.

Loibl–Pass is located in the mountains separating Austria and Slovenia. The Germans planned a tunnel through the mountains to aid in their efforts in the Balkans. Concentration camp prisoners formed a substantial portion of the labor force engaged in the tunnel construction. The camp was divided into two parts: one camp on the north (Aus-trian) side of the mountain and one on the south (Slovenian or Yugoslavian) side.

Lindert was initially stationed at the south camp, where he served as a guard on the outside of the tunnel and around the perimeter of the protective custody camp. He was later transferred to the northern camp, where he performed the same functions.

Throughout his service, Lindert received a monthly salary. Lindert was also permitted a limited amount of leave time each year.

*E. Lindert's surrender and POW internment*

In April 1945, the north camp ceased functioning and all personnel were transferred back to the south camp. Unlike some camps, Loibl–Pass was not liberated by Allied forces. Instead, it simply disintegrated, with the German forces scattering and fleeing.

On May 13, 1945, Lindert, along with a number of SS troops, surrendered to British forces somewhere between St. Veit and Klagenfurt, Austria. Lindert was one of thousands of German troops placed in several prisoner of war camps in Italy. Lindert was subsequently sent to a camp in England. After his release from POW camp on August 11, 1947, Lindert returned to Austria to live in a displaced persons camp with his family.

Shortly after Lindert was captured by the British, he was interviewed by British forces and by at least one German-speaking person. As a result of that interview, the British created a POW record on Lindert. Like the records of virtually every soldier captured in that area at that time, Lindert's POW record places him in an SS combat division during the war. Specifically, the POW record dated May 31, 1945 indicates that Lindert served in the "13.SS.Geb.Jg.Div." The origin of the information in the record is unclear, and the handwriting on the document is clearly not Lindert's. The most likely explanation for the information is that the British simply processed prisoners in large groups, with Lindert being processed along with the others with whom he was captured. The form explicitly indicates that it was to be completed "by or on behalf of" the POW, and all

indications are that Lindert merely signed the pre-prepared form.

On August 20, 1945, Lindert signed a second, pre-prepared British POW "form of personal particulars." On that form, Lindert is listed as having served in the "13.Geb." division. As with the May 31 form, with the exception of the signature line, the handwriting on the form is clearly not Lindert's.

The 13th SS Division, known as the "Handschar" or "Handzar" Division, was a combat division of SS soldiers, made up primarily of Muslims from Croatia. As the war drew to an end, troops from the 13th Division retreated through the Loibl–Pass area. About a dozen low-ranking guards from the Loibl–Pass camp were captured at the same time and in the same area as the troops from the 13th Division. Each of these soldiers' POW forms indicate that they served in various capacities in the Handschar. Lindert was among these captured soldiers.

Shortly after the liberation of concentration camps, Allied forces engaged in a thorough investigation of camp records and interviewed a large number of former camp inmates. These efforts were largely undertaken by a United States Army officer named Eugene S. Cohen. These investigations and reports resulted in massive volumes of documents. Prominent among them were the Mauthausen Death Books and Unnatural Death Books, chronological records detailing (with varying degrees of historical accuracy) the deaths of the more than seventy thousand prisoners who died at Mauthausen and its sub-camps between 1939 and 1945. Following the Cohen report, many war criminals were identified and brought to trial. None of the records or documents identifies Lindert, and no charges were ever brought against him.

### F. Lindert's visa applications

After spending more than two years in various prisoner of war camps, Lindert was released from British custody on September 10, 1947 and returned to Austria to find his family.

In June of 1951, following his parents' immigration to the United States, Lindert sought a visa for entry under the Displaced Persons Act. In contemplation of obtaining displaced person status, a prerequisite to a visa under the Displaced Persons Act, Lindert completed a "fragebogen" or questionnaire. The answers on the form contained spelling and grammatical errors which suggest that the person completing the form was not fluent in German. The fragebogen indicated that Lindert served in the Waffen SS during the war. The United States Displaced Persons Commission rejected Lindert's application, citing his service in the Waffen SS as evidence that he had participated in a "movement which is (was) hostile to the United States or its form of government." His rejection did not indicate that there was any distinction among the divisions of the SS.

Three years later, the American Consulate in Salzburg, Austria sent Lindert a letter inviting him to re-apply for a visa, this time under the Refugee Relief Act. Lindert and his wife completed the revised questionnaire in June of 1954. As with all the other forms, Lindert was recorded as having served in the 13th SS "Handschar" Division. The government offers no evidence that, at the time of his second application, Lindert had any reason to know that the United States now drew a distinction between the Handschar and the Totenkopf, given that both were part of the SS. Nor is there any persuasive evidence that Lindert's decision to leave the Handschar notation undisturbed was not a matter of convenience and the path of least resistance, rather than a part of some scheme to fraudulently obtain immigration benefits.

Lindert received an Immigrant Visa and Alien Registration on January 14, 1955. The Immigrant Visa and Alien Registration form was pre-typed by at least two different typewriters. The source of the information was presumably the application completed by Lindert in June of 1954, but there is no direct evidence regarding the contents of the form. It is certain that Lindert himself did not type the Vice Consul's document. Lindert's applications of June 1, 1954 and June 11, 1954 both indicate that he served in the Handschar Division. This was consistent with every document since the date of his

capture, and it is more likely than not that the same information was merely copied from one document to the next as a matter of form. The Immigration Visa and Alien Registration, however, changed this information. In a small box on line 26, under the heading "places of previous residence,"· someone (in all probability a. clerk) typed a summary of Lindert's information. In its entirety, that summary read: "from birth to 1942 Passbusch, Rumania; 1942–1945 with German Army; 1945–1947 prisoner of. war in England; 1947–to date DP Camp Haid, Post Ansfelden, Austria." The government in this action does not challenge the validity of Lindert's visa.

Less than one month after the consulate issued the visa, George and Frieda Lindert entered the United States. Lindert moved directly to Youngstown, Ohio, where he rejoined his family and worked for more than thirty years as a press operator in an aluminum factory.

### G. Lindert's application to file petition for naturalization

Lindert applied for United States citizenship on September 29, 1961 per their order of 9/18/95. A form N–400 was used in the Application to File Petition for Naturalization, and the information contained thereon was clearly written by someone other than Lindert. Lindert swore to his petition for naturalization, and it was eventually approved. He was granted United States citizenship and received Certificate of Naturalization No. 7914531 on December 6, 1962.

Question 7 of the N–400 form asks: "List each organization, association, fund, foundation, club or society in the United States or in any other place that you have been a member of at any time, and the dates of membership in each." An INS examiner who reviewed the form with Lindert in an interview conducted entirely in English corrected the original entry ("None") to indicate that Lindert had belonged to the Saxon Club and the Laborers Union. Question 19 of the N–400 form asks an applicant if he or she is a person lacking good moral character, defin-

ing that term as a person who "advocated or practiced polygamy, got his or her income principally from illegal gambling activities; has committed adultery; has been a prostitute; has procured any person for the purposes of prostitution; has been a narcotic drug addict; or has dealt in narcotic drug illegally in any way." Lindert indicated that he did not lack good moral character.

No question on Lindert's N–400 form inquired about Lindert's wartime service, and there is no evidence that anything was ever asked of him regarding his wartime service. Accordingly, nothing on the N–400 form indicates what Lindert's wartime activities were. Evidence offered by the government suggesting that the examiner would have made such an inquiry was unpersuasive given the timing of the application and the conditional, equivocal testimony of the INS witnesses. Following amendments to the N–400 shortly after Lindert's application, examiners clearly were instructed to inquire about an applicant's "foreign military service." There is no persuasive evidence, however, that such an inquiry was standard practice at the time Lindert made his application.[2] Nor is there credible evidence that Lindert himself was asked about his wartime service, either orally or on the application form. In a case such as this one, this Court is not permitted to speculate about what answer Lindert would have given had he been asked such a question. Similarly, this Court cannot speculate as to what information the government *intended* to elicit with its questions.

## II.

■ A certificate of naturalization must be revoked if it was (1) procured illegally; or (2) procured by concealment of material fact or by willful misrepresentation. 8 U.S.C. § 1451(a).

[O]nce a district court determines that the Government has met its burden of proving that a naturalized citizen obtained his citizenship illegally or by willful misrepresentation, it has no discretion to excuse the conduct.

---

**2.** Moreover, this Court notes that the form was changed subsequent to Lindert's application. In

the amended form, applicants were specifically asked about their prior military service.

*Fedorenko v. United States,* 449 U.S. 490, 517, 101 S.Ct. 737, 753, 66 L.Ed.2d 686 (1981).

## A. Burden of proof

The evidence supporting such a revocation of citizenship "must be 'clear, unequivocal, and convincing' and not leave 'the issue in doubt'." *Fedorenko,* 449 U.S. at 505, 101 S.Ct. at 747 (citations omitted). "This requirement is mandated by the magnitude of the right that is at stake in a denaturalization proceeding: 'Citizenship obtained through naturalization is not second-class citizenship.'" *United States v. Demjanjuk,* 518 F.Supp. 1362, 1363 (N.D.Ohio 1981) citing *Knauer v. United States,* 328 U.S. 654, 658, 66 S.Ct. 1304, 1307, 90 L.Ed. 1500 (1946). Denaturalization actions present

> extremely serious problems. They involve not only fundamental principles of our political system designed for the protection of minorities and majorities alike. They also involve tremendously high stakes for the individual. For denaturalization, like deportation, may result in the loss "of all that makes life worth living." Hence, where the fate of a human being is at stake, we must not leave the presence of his evil purpose to conjecture.

*Id.* at 659, 66 S.Ct. at 1307, quoting *Ng Fung Ho v. White,* 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938 (1922) (citation omitted). *Costello v. United States,* 365 U.S. 265, 269, 81 S.Ct. 534, 536, 5 L.Ed.2d 551 (1961) ("American citizenship is a precious right. Severe consequences may attend its loss, aggravated when the person has enjoyed his citizenship for many years").

> This is not a naturalization proceeding in which the Government is being asked to confer the privilege of citizenship upon an applicant. Instead the Government seeks to turn the clock back [more than thirty] years after full citizenship was conferred upon petitioner by a judicial decree, and to deprive him of the priceless benefits that derive from that status. In its consequences it is more serious than a taking of one's property, or the imposition of a fine or other penalty. For it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an

individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized men. This does not mean that once granted to an alien, citizenship cannot be revoked or canceled on legal grounds under appropriate proof. But such a right once conferred should not be taken away without the clearest sort of justification and proof. So, whatever may be the rule in a naturalization proceeding, [in an action to revoke a citizen's naturalization] we believe the facts and the law should be construed as far as is reasonably possible in favor of the citizen. Especially this is so when the attack is made long after the time when the certificate of citizenship is granted and the citizen has meanwhile met his obligations and committed no act of lawlessness.

*Schneiderman v. United States,* 320 U.S. 118, 122, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796 (1943) (citation omitted). Thus, the burden to present clear, unequivocal and convincing evidence is squarely on the government in such actions. *Fedorenko,* 449 U.S. at 505, 101 S.Ct at 746–47.

## B. Illegal procurement

Naturalization is illegally procured "if some statutory requirement which is a condition precedent to naturalization is absent at the time the petition for naturalization is granted." *United States v. Demjanjuk,* 518 F.Supp. 1362, 1382 (N.D.Ohio 1981), *aff'd,* 680 F.2d 32 (6th Cir.) *cert. denied* 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982). *See also United States v. Leprich,* 666 F.Supp. 967, 968 (E.D.Mich.1987) (revoking naturalization as illegally procured where defendant obtained citizenship using invalid immigrant visa). "Good moral character" is a condition precedent for naturalization. 8 U.S.C. § 1427(a)(3) and (e). Thus, if a court finds that the defendant was not a person of "good moral character" at the time of his or her naturalization, the court must revoke that naturalization for having been illegally procured. *Id.; Fedorenko,* 449 U.S. at 517, 101 S.Ct. at 752–53.

■ In determining whether an applicant is of good moral character, a court must consider the provisions of 8 U.S.C. § 1101(f). In addition to excluding drunks, gamblers, and murderers as being of bad moral character, § 1101(f) provides that

> No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was ... one who has given false testimony for the purpose of obtaining benefits under this chapter.

8 U.S.C. § 1101(f)(6). Accordingly, if a court finds that a defendant gave false testimony for the purpose of obtaining immigration benefits or citizenship, that court must find that the defendant procured the citizenship illegally and revoke the defendant's citizenship. *See* 8 U.S.C. § 1451(a); *Cf. Fedorenko,* 449 U.S. at 514, 101 S.Ct. at 751 ("a naturalized citizen's failure to comply with the statutory prerequisites for naturalization renders his certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a)"); *United States v. Ginsberg,* 243 U.S. 472, 475, 37 S.Ct. 422, 425, 61 L.Ed. 853 (1917) ("No alien has the slightest right to naturalization unless all statutory requirements are complied with.... If procured when proscribed qualifications have no existence in fact, it is illegally procured; a manifest mistake by the [immigration] judge cannot supply these nor render their existence nonessential.").

> On its face, § 1101(f)(6) does not distinguish between material and immaterial misrepresentations. Literally read, it denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits.... The absence of a materiality requirement in § 1101(f)(6) can be explained by the fact that its primary purpose is not (like § 1451(a)) to prevent false pertinent data from being introduced into the naturalization process (and to correct the result of the proceedings where that has occurred), but to identify lack of good moral character.

*Kungys v. United States,* 485 U.S. 759, 779–80, 108 S.Ct. 1537, 1551, 99 L.Ed.2d 839 (1988).

■ Under the terms of § 1101(f)(6), no person is deemed to lack "good moral character" for (1) statements which do not constitute "testimony"; (2) statements which were not made with the subjective intent of obtaining immigration benefits; or (3) concealments (as contrasted with affirmative statements or denials). *Kungys,* 485 U.S. at 780–81, 108 S.Ct. at 1551–52.

In addition to the enumerated classes of persons deemed to lack "good moral character," § 1101(f) provides that "[t]he fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not a person of good moral character." 8 U.S.C. § 1101(f).

### C. *Procurement by concealment or misrepresentation*

■ Under § 1451(a), a court must revoke the citizenship of any person whose citizenship was "procured by concealment of material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). In *Kungys v. United States,* 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988), the Supreme Court held that § 1451(a)

> plainly contains four independent requirements: the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment.

*Kungys,* 485 U.S. at 767, 108 S.Ct. at 1544–45. Materiality, for purposes of § 1451(a), hinges on whether the concealments or misrepresentations "had a natural tendency to influence the decisions of the Immigration and Naturalization Service." *Id.* at 772, 108 S.Ct. at 1547.

■ The provisions of § 1451(a) are not implicated by any statements or representations made outside the naturalization proceeding. *Id.* at 773–75, 108 S.Ct. at 1548. As the Supreme Court noted in *Kungys,* if

the government wishes to challenge a person's statements on his or her visa application, it may do so by challenging the visa itself. The government may not mount such a challenge, however, in the context of an action to revoke a defendant's citizenship. *Id.* at 774 n. 8, 108 S.Ct. at 1548 n. 8.

█ If it is demonstrated that a defendant made a material misrepresentation during the proceeding in which he or she obtained citizenship, there is a presumption that the defendant's citizenship was procured through the misrepresentation. *Id.* at 775–77, 108 S.Ct. at 1549. However, the Supreme Court held in *Kungys* that

> The importance of the rights at issue leads us to conclude that the naturalized citizen should be able to refute that presumption, and avoid the consequence of denaturalization, by showing, through a preponderance of the evidence, that the statutory requirement as to which the misrepresentation *had a natural tendency* to produce a favorable decision was in fact met.

*Id.* at 777, 108 S.Ct. at 1550 (emphasis in original).

### III.

*A. Count I—Illegal procurement: Service as guard*

█ Count I of the government's complaint asserts that Lindert's· service as a guard at Mauthausen and Loibl–Pass requires a finding that at the time of his applications, Lindert was a person of bad moral character. According to the government's argument, service as a guard at a place where prisoners are persecuted is sufficient and irrebuttable evidence of bad moral character. For the reasons stated below, this Court is not persuaded by this argument and finds that the government has failed to present sufficient evidence to support its allegations in Count I.

In *Fedorenko,* an action brought under the Displaced Persons Act, the Supreme Court held that

> a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp. to visit a

nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp ...

is subject to denaturalization. *Fedorenko,* 449 U.S. at 512 n. 34, 101 S.Ct. at 750 n. 34. With respect to this list of activities, the Sixth Circuit has noted, "Obviously, Fedorenko's most egregious conduct was shooting at escaping inmates." *Petkiewytsch v. I.N.S.,* 945 F.2d 871, 880 (6th Cir.1991). In a deportation action against Petkiewytsch, a former concentration camp guard who met all the descriptions of Fedorenko with the exception of ever firing his gun, the Sixth Circuit held that he had not "assisted in persecution" for purposes of the Holtzman Amendment. *Id.* at 881. While neither of these cases involved the statute specifically in place at the time of Lindert's immigration, they are nonetheless instructive on the issue of moral character.

Significantly, in this case, the government has presented no evidence that Lindert ever fired his gun or took any other action hostile to any prisoner. In fact, Lindert credibly testified that he never touched a prisoner or participated in brutalities against any prisoners. Furthermore, there is no evidence that Lindert engaged in any of the decision-making surrounding the operations of the camp or the treatment of its prisoners. Lindert was under orders to shoot escaping prisoners, but he was never faced with an occasion to act or to refuse to act on these orders. This Court will not judge a person's moral character based solely on the orders issued to that person. A person's actions or decisions may form a basis upon which a court could judge that person's moral character. In some circumstances, a person's inaction may also provide information relevant to the assessment of that person's moral character. In this case, however, the government is burdened with showing clear, convincing and unequivocal evidence to support the assertion that Lindert's moral character was irreparably soiled by his actions or inactions while he was a guard. The evidence here does not compel this Court to make such a finding.

Accordingly, this Court finds that the government has not demonstrated, to the requisite degree of certainty, that Lindert was not

a person of good moral character at the time he applied for naturalization.

### B. Count II—Illegal Procurement: False testimony

The government presented this Court with a number of Lindert's statements made over the course of several decades, asserting that the statements' alleged falsity demonstrates a lack of good moral character under § 1101(f)(6). The statements include Lindert's POW records, his visa applications, and his Application to File Petition for Naturalization. For the reasons stated below, the government has not proved to the requisite degree of certainty that any of these documents represent false testimony for purposes of § 1101(f)(6).

#### 1. Lindert's POW records

The government presented this Court with a number of POW records and "forms of personal particulars" dating from Lindert's capture by the British. This Court need not consider any statements found on those documents because the testimony they represent was not given for the purpose of obtaining United States immigration benefits. The explicit terms of § 1101(f)(6) provide that it is only implicated by "false testimony given for the purpose of obtaining any benefits under" the United States Immigration and Nationality Act. 8 U.S.C. § 1101(f)(6). *See also Kungys,* 485 U.S. at 780, 108 S.Ct. at 1551. Section 1101(f)(6) proscribes a finding of good moral character only when false testimony is given with the "precise intent" of obtaining immigration benefits. *Id.*

> Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, were not deemed sufficiently culpable to brand the applicant as someone who lacks good moral character.

*Id.* Nothing in Lindert's POW records implicate § 1101(f)(6) because they were clearly not completed for the purpose of immigration to the United States.

#### 2. Lindert's visa applications

Section 1101(f)(6) is focused on the fact of a lie, and not on the substance of the lie. The substance of the lie is immaterial to consideration of § 1101(f)(6). *Kungys,* 485 U.S. at 779–80, 108 S.Ct. at 1551. The only consideration for a court, therefore, is whether the government has proved with sufficiently clear, unequivocal and convincing evidence that a particular statement was (1) given with the purpose of obtaining immigration benefits, (2) made under oath, and (3) false.

As noted above, § 1101(f)(6) is not concerned with the substance of any false testimony; it is merely concerned with the fact that a petitioner gave false testimony. It is for this reason that § 1101(f)(6) contains no materiality requirement. Because the fact of a lie is at issue, the government must be held to an exceedingly high standard of proof. The evidence produced here does not persuasively demonstrate a clearly false statement in violation of § 1101(f)(6), and therefore, does not meet the heavy burden required to prove the fact of a lie.

Question 26 of the typewritten Application for Immigrant Visa and Alien Registration provides a small box calling for an applicant's "places of previous residence." Question 26 calls only for information regarding the applicant's whereabouts. It does not specifically request any information about the activities of the applicant at those "places of previous residence." Into this box, someone other than Lindert included a summary of Lindert's residences. The government challenges the portion of the response which reads "1942–1945 with German Army."

This Court finds that the government has not demonstrated with unequivocal evidence that the statement was, in fact, false. Lindert's military service was with the Waffen SS, a branch of the armed forces of Germany. A host of documents in the record support the assertion that the Waffen SS was considered part of the "Wehrmacht" by persons in Germany. While the Waffen SS could not be confused as being part of the German "Heer," this Court heard credible evidence that the Waffen SS was a part of the German armed forces (or "Wehrmacht"). This Court does not hesitate to find that the distinction between the "army" and the "armed forces" is not particularly clear, par-

ticularly when considered from the perspective of a petitioner with a limited education and only moderate proficiency in English. In light of this, even if this Court *had* found that the statement in Question 26 was "false," there is no persuasive evidence that Lindert intended to supply false information.

■ Nothing in § 1101(f)(6) explicitly addresses the question of an applicant's knowledge. The purpose of § 1101(f)(6) is to identify and exclude persons whose moral character would permit them to give false testimony. It is not concerned with the substance of any particular statement, except to the extent that the statement illustrates a willingness to perjure for purposes of immigration benefits. Because the moral character of the applicant and not the substance of the statement, is the focus of the issue, an applicant's knowledge must be relevant under § 1101(f)(6). An applicant who provides false testimony which the applicant believes is true may not have satisfied certain other immigration requirements. However, an applicant's moral character cannot be implicated by the falsity of a statement which the applicant believes is true. For example, an applicant may be required to provide his or her spouse's date of birth. If the government discovers, years later, that the applicant's spouse had concealed her or his true birth date from the applicant (who then repeated the falsehood on the application), the applicant's moral character is not implicated by the falsity of the date originally noted on the form. So long as an applicant was providing testimony the applicant believed to be true, the applicant was not providing false testimony in violation of § 1101(f)(6).

The government presented evidence regarding the differences in command structures, uniforms, and duties between the Heer and the Waffen SS. There is little credible evidence, however, that any of the distinctions would have alerted Lindert to the distinction on his form between "German army" and "German armed forces." This Court finds that it is more likely than not that Lindert believed that the statement was accurate. Accordingly, Lindert's answer to Question 7 does not implicate § 1101(f)(6).

■ Finally, this Court is not persuaded that Question 7 calls for any greater specificity than that provided in Lindert's answer. That is, Lindert's failure to name each city to which he was assigned from 1942 until 1945 or what particular duties he had in those cities does not constitute false testimony. Lindert's indication that he was engaged in military service during that time period was sufficiently responsive and accurate for purposes of a question designed to ascertain an applicant's residences.

### 3. Lindert's petition for naturalization

■ The government alleges that Lindert's Application to File Petition for Naturalization implicates § 1101(f)(6) because it contains an allegedly incomplete answer. Specifically, in response to Question 7 of that form, Lindert gave the answer "Saxon Club, Laborers Union, no others." The government asserts that Lindert's failure to include mention of his wartime service in the Waffen SS constitutes false testimony.

> Question 7 asks a petitioner to list each organization, association, fund, foundation, club or society in the United States or in any other place that you have been a member of at any time, and the dates of membership in each.

Nothing in the form makes particular mention of military service. Furthermore, there is no sufficiently credible evidence that any examiner ever inquired about Lindert's military service. Accordingly, Lindert's failure to list his military service on a question which does not explicitly call for such an answer does not implicate § 1101(f)(6).

It may be that the government intended to elicit information about applicants' wartime activities. In the absence of any questions which clearly call for that information, however, this Court cannot find that Lindert gave false testimony in his response to Question 7.

### C. *Count III—Concealment of material fact*

■ Of the documents containing statements the government alleges are false, only the Application to File Petition for Naturalization are relevant to Count III. *See Kun-*

**1128**

*gys,* 485 U.S. at 773, 108 S.Ct. at 1547–48 (information given for any purpose other than naturalization, including information given in an effort to obtain a visa, not covered by § 1451(a)). The only statement the government challenges on Lindert's N–400 form are the responses to Question 7. Specifically, the government alleges that Lindert's failure to indicate his military service constitutes willful misrepresentation or concealment of a material fact.

As noted above, this Court cannot determine from the plain language of Question 7 that the question intended for an applicant to provide information about his military service. Furthermore, the government failed to provide sufficiently convincing evidence that an examiner asked Lindert about his military service. In the absence of any question demanding information regarding military service, this Court cannot find that Lindert's silence regarding his military service constituted either a misrepresentation or a concealment for purposes of § 1451(a).

Even if this Court had found that the omission constituted a concealment, the government did not provide any compelling evidence that the concealment was willful. In fact, Lindert's testimony and the trail of paper records which led to the information on the N–400 form suggest the opposite. The absence of clear and convincing evidence of the willfulness of a misrepresentation or concealment compels this Court to find that the government did not meet its burden of proving that Lindert's answer to Question 7 violated § 1451(a). *Kungys,* 485 U.S. at 767, 108 S.Ct. at 1544–45.

### IV.

In sum, for the reasons stated above, this Court finds that the government did not prove with sufficiently convincing evidence that Lindert's moral character was inadequate for citizenship because of his military service or his answers to questions on immigration and naturalization forms. Furthermore, Lindert's responses on his naturalization petition did not constitute willful misrepresentation or concealment of a material fact. Accordingly, the order of the Mahoning County Common Pleas Court of December 11, 1962, (Petition No. 26492, Certificate No. 7914531, nationalizing George Lindert) is sustained.

This order is final and appealable.

IT IS SO ORDERED.